# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

COMMODITIES EXPORT COMPANY,

     Plaintiff/Counter-Defendant,

v.                                   Case No. 09-CV-11060-DT

CITY OF DETROIT, UNITED STATES OF
AMERICA,

     Defendants/Cross-Defendants,

and

DETROIT INTERNATIONAL BRIDGE
COMPANY,

     Defendant/Counter-Plaintiff/Cross-
     Plaintiff/Third Party Plaintiff,

v.

WALTER LUBIENSKI and DEAN AYTES,

     Third Party Defendants.

_____/

## OPINION AND ORDER DENYING DIBC'S MOTION FOR SUMMARY JUDGMENT AND GRANTING THE UNITED STATES'S MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

The Ambassador Bridge spans the international border defined by the Detroit

River from Detroit, Michigan on the American side to Windsor, Ontario on its opposite

shore. The bridge is privately owned and operated by the Detroit International Bridge

Company ("DIBC"). This litigation began with, and appears to revolve around,

allegations that DIBC regularly resorts to a self-claimed status of "federal

instrumentality," and the immunity from local and state regulation that such status

implies.  Defendant United States of America (or "Government") argues that if DIBC were truly a federal instrumentality, certain implications would arise, including potential obligations or liabilities inhering to the federal government of which the United States wants no part.  Before the court is a motion, filed on February 5, 2010 by Defendant United States of America, captioned "Motion for Summary Judgment on 'Federal Instrumentality' Status of DIBC" [Dkt. # 55] in which the United States seeks a declaratory judgment that DIBC does not qualify for federal instrumentality status. Defendant/Cross Plaintiff DIBC filed its essentially mirror-image "Motion for Summary Judgment" [Dkt. # 63] on February 26, 2010.  The matters have been fully briefed and the court conducted a hearing on April 28, 2010.  For the reasons stated below, the court will grant the motion of the United States and deny DIBC's.

## II.  BACKGROUND

Plaintiff Commodities Export Company initiated this action on March 20, 2009, against Defendants the United States of America and the City of Detroit. Plaintiff later filed an amended complaint on May 1, 2009.  On December 21, 2009, following the conclusion of discovery, the court granted a motion to intervene filed by DIBC.  Thereafter, by stipulation, Plaintiff filed its "Second Amended Complaint."

DIBC filed a Counter-Complaint against Plaintiff, and a Third Party Complaint against Walter Lubienski and Dean Aytes.  Plaintiff and Third Party Defendants have filed a motion for partial summary judgment related to the Counter-Complaint and Third Party Complaint.  That motion will not be addressed in this order.

On February 5, 2010, the United States filed a Cross Claim against DIBC.

The parties have since filed various motions seeking to limit or resolve the issues

before the court.  At issue in this order are 1) a motion for summary judgment filed by the United States on the issue of DIBC's "federal instrumentality" status, and 2) DIBC's related motion for summary judgment on the United States's Cross Claim.

## A.  Plaintiff's Claims

In its "Second Amended Complaint," Plaintiff alleges that it is the owner of property located at 3317-3325-3331 West Lafayette, Detroit, Michigan in the immediate area of the international Ambassador Bridge.  (2nd Am. Compl. ¶ 2.)  Plaintiff further contends that the Defendant City of Detroit is a Michigan municipal corporation with jurisdiction over streets and roads in the City of Detroit and specifically over 23rd Street and W. Lafayette in the City of Detroit.  (2nd Am. Compl. ¶ 3.)  Defendant DIBC is a for-profit Michigan business corporation which owns and operates the Ambassador Bridge.  (2nd Am. Compl. ¶ 4.)

According to the "Second Amended Complaint," sometime before November 27, 2008, contractors in the employ of DIBC removed and destroyed the roads (portions of 23rd Street and W. Lafayette) in front of and leading to Plaintiff's property.  (2nd Am. Compl. ¶ 8.)  The property is currently rented and the tenants cannot conduct their business, receive customers or obtain police or fire protection.  (2nd Am. Compl. ¶ 9.) There are no known government sanctioned plans for removing or abandoning Lafayette or 23rd Street.  (2nd Am. Compl. ¶ 10.)  Removing Lafayette or 23rd Street leaves Plaintiff's property without access, landlocked and valueless.  (2nd Am. Compl. ¶ 11.)

Plaintiff alleges that under certain federal regulations and statutes, the U.S. Customs and Border Protection, an agency of the United States Government, is

responsible for enforcing the requirement that a duty free establishment must make delivery of tax and duty-free merchandise from a sealed compound to insure exportation of such merchandise and preclude such merchandise from returning to the United States. (2nd Am. Compl. ¶ 5.) Plaintiff further contends that the U.S. Customs and Border Protection has tacitly endorsed the taking of Plaintiff's land by finding that the Ammex Duty Free Store operated at the Ambassador Bridge is in compliance with the "sealed compound" requirement when the Ammex is only "sealed" due to the expropriation of City streets. (2nd Am. Compl. ¶ 6.)

The Michigan Supreme Court has issued an opinion affirming a lower court determination that DIBC is an instrumentality –albeit a "limited" instrumentality– of the United States Government. (2nd Am. Compl. ¶ 4.) Plaintiff contends that this designation has hindered or prohibited the City of Detroit from enforcing its ordinances against DIBC. (2nd Am. Compl. ¶ 12.)

Under Count I of the "Second Amended Complaint," Plaintiff asserts that the City of Detroit has failed to enforce its ordinances against DIBC and that, therefore, the City of Detroit and the DIBC have engaged in acts that constitute a taking of Plaintiff's property rights without just compensation under the Fifth Amendment of the Constitution. (2nd Am. Compl. ¶ 14-18.) Plaintiff also asserts this claim against the United States of America, arguing that the Government is responsible for the actions of its agent and instrumentality, DIBC. (2nd Am. Compl. ¶ 19-20.) Plaintiff requests in this claim that the court (1) "[e]njoin all obstructions of 23rd and W. Lafayette in the vicinity of Plaintiff's property and affirmatively require that the streets be replaced forthwith" and

(2) "[o]rder whatever other relief this [c]ourt determines to be appropriate."  (2nd Am. Compl. ¶ 20.)

Under Count II, Plaintiff asserts a claim against DIBC entitled "Intentional Trespass/Nuisance/Interference with Easement."  Plaintiff contends that DIBC has trespassed and interfered with the easement rights which Plaintiff and all other abutting land-owners share in the property "across and [a]long these roads to access their property and . .  to the center line of all roads."  (2nd Am. Compl. ¶ 22.)  Plaintiff requests that the court order the abatement of DIBC's public and private nuisance, and award damages and attorney fees associated with DIBC's trespass.  (2nd Am. Compl. ¶ 28.)

In Count III, Plaintiff seeks injunctive and declaratory relief.  Specifically, Plaintiff seeks a declaration that DIBC "is not a federal instrumentality or that they are otherwise bound to follow the Ordinances of the City of Detroit with respect to Plaintiff's property."  (2nd Am. Compl.¶ 34.)  Plaintiff also seeks injunctive relief requiring the City of Detroit to enforce its ordinances, and requiring DIBC to cease its actions with respect to W. Lafayette and 23rd Street and reconstruct the roads.  (2nd Am. Compl. ¶ 34.)

In Count IV, Plaintiff asks the court to issue a mandamus requiring the City of Detroit to enforce its ordinances, ordering the abatement of Defendants' public and private nuisance, and ordering the United States to compel its agent and instrumentality to discontinue its interference with Plaintiff's property rights.  (2nd Am. Compl.¶ 40.)

Count V asserts an action against DIBC under 42 U.S.C. § 1983.  Plaintiff claims that DIBC's actions with respect to the relevant property has been taken under the color

of state law, with a "mantle of authority" which subjects DIBC to liability under § 1983. (2nd Am. Compl.¶¶ 42-49.)

Count IV asserts a "Bivens" claim against DIBC, arguing that DIBC has also taken its actions under the color of federal law and, as such, should be compelled to cease its alleged unconstitutional actions. (2nd Am. Compl. ¶¶ 51-54.)

Finally, in Count VI, Plaintiff asserts an "Interference with Business Expectancy" claim against DIBC.

## B. Cross Claim by the United States

In its Cross Claim, the United States asserts one Count against DIBC, entitled "Misappropriation of Federal Status." The United States alleges that DIBC continuously holds itself out as a federal instrumentality and the United States specifically opposes this characterization of DIBC. (Cross Cl. at ¶¶ 7-10.) The United States contends that it is improper to invoke federal instrumentality status over the objection of the Government. (Cross Cl. ¶ 20.) The United States asserts that "Plaintiff Commodities has stated claims against the United States in this action on the grounds that the federal government's instrumentality, DIBC, has committed an unconstitutional taking[ ] and otherwise interfered with Commodities's rights," (Cross Cl. ¶ 15), but that because DIBC is not a federal instrumentality "DIBC's misfeasance or alleged misfeasance towards Commodities, is not properly attributable to the federal government," (Cross Cl. ¶ 21). The United States thus seeks declaratory and injunctive relief as follows:

> Pursuant to 28 U.S.C. §2201, Fed. R. Civ. Proc. 57, and this Court's inherent authority, the United States hereby requests enforcement of federal law through a declaration by the Court that DIBC is not a federal instrumentality or limited federal instrumentality or any type of appendage of the federal government.

Pursuant to 28 U.S.C. §2202 and this Court's inherent authority, the United States hereby requests that the Court permanently enjoin DIBC and its corporate affiliates from misappropriating the status of "federal instrumentality," and to cease and desist from misrepresenting that it is any kind of federal instrumentality or other arm or agent of the federal government, in state court, federal court, or elsewhere.

(Cross Cl. ¶¶ 22-23.)

## C. Michigan Supreme Court Case

Much of the substance of the parties' arguments herein arise out of or relate to an opinion rendered by the Michigan Supreme Court in 2008. In *City of Detroit v. Ambassador Bridge Co.*, 748 N.W.2d 221 (Mich. 2008), the City of Detroit filed an action against DIBC to enforce its zoning ordinance to stop DIBC's construction projects located in and around the Ambassador Bridge's footprint, specifically related to the construction of toll booths. After a four-week bench trial, the trial court issued an opinion finding that DIBC was immune from Detroit's zoning ordinance due to its status as a federal instrumentality. *Id.* at 223-24. The trial court also found that Detroit's zoning ordinance was preempted by the federal government's "demonstrated intent to control the entire bridge complex." *Id.* at 224. The Michigan Court of Appeals reversed on both grounds. *Id.* The Michigan Supreme Court subsequently reversed the Court of Appeals and found that DIBC "is a federal instrumentality for the limited purpose of facilitating traffic over the Ambassador Bridge and, as such, is immune from the zoning regulation of the city of Detroit that would preclude construction projects furthering this limited federal purpose." *Id.* at 223. In so holding, the Michigan Supreme Court noted:

We note that the DIBC's status as a federal instrumentality is limited to actions that are clearly and directly associated with the facilitation of traffic across the Ambassador Bridge. Accordingly, the DIBC may not fit its non-traffic-facilitative actions into this status. This issue could be described as evaluating the scope of the federal instrumentality's

immunity. This issue is particularly important in cases of limited federal instrumentalities, such as this case, because immunity extends only to acts that are within the scope of instrumentality's federal purpose. While we do not attempt to list all the actions that do or do not fall within the DIBC's scope of immunity, we agree with the trial court that the DIBC's construction projects are within its scope of immunity.

*Id.* at 230-31. Having determined that DIBC is a "limited federal instrumentality and holding that its construction projects were actions within its scope of immunity," the court next addressed whether enforcement of the subject City of Detroit ordinances would interfere with DIBC's federal function. *Id.* at 231. The court stated that "if the city's ordinance does interfere with the DIBC's limited federal purpose, we must analyze the magnitude of that interference because federal instrumentalities are not 'insulated from incidental or nonburdensome local requirements.'" *Id.* (citing *Don't Tear It Down, Inc. v. Pennsylvania Ave. Development Corp.*, 642 F.2d 527 (D.C. Cir. 1980)). The court found that the City of Detroit's ordinance did, in fact, inhibit DIBC's federal purpose. The court thus concluded that "the DIBC, as a limited federal instrumentality, is immune from the city's ordinance as it applies to the construction projects before us."

*Id.* at 233. The court's "Conclusion" section stated:

> After accepting the facts established by the trial court, we affirm the judgment of the trial court, reverse the judgment of the Court of Appeals, and hold that the DIBC is a federal instrumentality for the limited purpose of facilitating traffic flow across the Ambassador Bridge and is, therefore, immune from any state law or local regulation that directly inhibits that purpose. Further, we affirm the trial court's holding that this particular application of the city's zoning ordinance inhibits the DIBC's federal purpose. However, we choose not to formulate an arbitrary bright-line rule concerning future conflicts between the DIBC, in its limited federal-instrumentality status, and state or local regulation. We trust the trial courts to examine whether a state law or local regulation directly inhibits the DIBC's unique and limited federal-instrumentality status in any future disputes.

The judgment of the Court of Appeals is reversed, and the case is remanded to the trial court for the entry of an injunction consistent with this opinion.

*Id.*

On July 31, 2008, after the case had been remanded, the trial court judge issued

a permanent injunction ordering that:

> the City of Detroit and its agencies, departments, and personnel are hereby permanently enjoined from enforcing or implementing any ordinance, regulation, policy, practice, rule or procedure the purpose of effect of which would directly inhibit the [DIBC], its successors and assigns conducting its activity as a federal instrumentality which includes, addressing, expanding, improving, managing or in any manner facilitating the flow of traffic across the Ambassador Bridge.

(7/31/08 Injunction at 2, DIBC's Resp. Br. Ex. C.)

## III. STANDARD[1]

Under Federal Rule of Civil Procedure 56, summary judgment is proper when

there is no genuine issue as to any material fact and the moving party is entitled to

judgment as a matter of law. Fed. R. Civ. P. 56(c). "In deciding a motion for summary

judgment, the court must view the evidence in the light most favorable to the non-

moving party, drawing all reasonable inferences in that party's favor." *Sagan v. United*

*States*, 342 F.3d 493, 497 (6th Cir. 2003). "Where the moving party has carried its

burden of showing that the pleadings, depositions, answers to interrogatories,

admissions and affidavits in the record, construed favorably to the non-moving party, do

not raise a genuine issue of material fact for trial, entry of summary judgment is

---

[1]The parties all treat the cross-motions as motions under Federal Rule of Civil Procedure 56. DIBC's motion, however, could likely have been filed under Rule 12(b)(6) as it appears to be directed primarily at the pleadings. Nonetheless, as the parties all label their motions as summary judgment motions, and as they all rely on matters outside of the pleadings, the court will analyze them under Rule 56.

9

appropriate." *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

The court does not "'weigh the evidence [to] determine the truth of the matter but[, rather,] to determine whether there is a genuine issue for trial.'" *Sagan*, 342 F.3d at 497 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). The moving party discharges its burden by "'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Horton v. Potter,* 369 F.3d 906, 909 (2004) (citing *Celotex*, 477 U.S. at 325). The burden then shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party must put forth enough evidence to show that there exists "a genuine issue for trial." *Horton,* 369 F.3d at 909 (citing *Matsushita*, 475 U.S. at 587). Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson*, 477 U.S. at 251-52.

## IV.  DISCUSSION

### A.  DIBC's Motion

DIBC argues that it is entitled to summary judgment on the Government's Cross Claim for a variety of reasons, but the organization-by-shotgun methodology of DIBC's brief makes it difficult to identify with precision the arguments on which DIBC relies. The "Argument" section of DIBC's brief, however, identifies three distinct theories, specifically identified and enumerated under separate headings. The Government's response focuses on these three arguments as does DIBC's reply. The court will

therefore primarily devote its analysis to these three arguments. Under a heading entitled "Introduction and Summary of the Arguments," DIBC includes eight additional, or supplemental, subheadings. Some of these subheadings are merely factual assertions (*see* subheadings 1, 2), some overlap with DIBC's primary arguments (*see* subheadings 6-8), and many attack Plaintiff's complaint (*see* subheadings 3-5). DIBC seems to argue that if Plaintiff's complaint fails, then the Government's Cross Claim must be dismissed. However, as will be discussed below, the Government's Cross Claim has identified a sufficient federal claim to invoke this court's jurisdiction and is not dependant on the success or vitality of Plaintiff's claims. Further, a motion for summary judgment on the Government's Cross Claim is not the appropriate place to advance an attack on Plaintiff's complaint. The court rejects any DIBC argument that relates to Plaintiff's complaint.[2]

---

[2] Nonetheless, it bears mention that one of DIBC's arguments appears to have been revealed as disingenuously inconsistent with its nearly contemporaneous pleading in another case. DIBC asserts that it has "not taken or claimed to take any action Plaintiff complains of based on the fact that DIBC is a federal instrumentality." (DIBC's Mot. Br. at 3.) Instead, DIBC contends that it either owned both sides of 23rd Street or it had the permission of the owners of 23rd Street. DIBC states that the City, at MDOT's request, closed Lafayette for the Gateway Project, and DIBC constructed an access road to the Bait Shop. (*Id.*) DIBC asserts it was not acting as a federal instrumentality in these actions. (*Id.*)

Plaintiff, however, has filed a response to DIBC's motion, relevant to the arguments asserted against Plaintiff's complaint. Attached to the response is a pleading filed in state court on March 5, 2010, which seeks a declaration of rights regarding a portion of 23rd Street. (Pl.'s Resp. at Ex. A.) The pleading states that it is based in part on Michigan statutory and common real property law and "partly upon this Court's permanent injunction and upon the decision of the Michigan Supreme Court, which unanimously 'h[e]ld that DIBC is a federal instrumentality for the limited purpose of facilitating traffic flow across the Ambassador Bridge and is, therefore, immune from any state law or local regulation that directly inhibits that purpose.'" (*Id.*, citing *City of Detroit v. Ambassador Bridge Co.*, 481 Mich. 29 (2008) (alteration in original).)

### 1. Justiciable Controversy

DIBC first argues that there is no justiciable controversy between it and the United States.  As DIBC points out, the Sixth Circuit has "recognized that declaratory judgment actions often require courts to face the difficult task of distinguishing 'between actual controversies and attempts to obtain advisory opinions on the basis of hypothetical controversies.'"  *Coalition for Government Procurement v. Federal Prison Industries, Inc.*, 365 F.3d 435, 458 (6th Cir. 2004) (quoting *Kardules v. City of Columbus*, 95 F.3d 1335, 1343-44 (6th Cir. 1996)).  Indeed, "the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, 'does not broaden the jurisdiction granted to the federal courts by the Constitution and statutes enacted pursuant thereto,' and that, consequently, 'there still must be a case or controversy before a federal court can assume jurisdiction and reach the merits of a [declaratory judgment action]."  *Id.* at 458-459 (quoting *Brennan v. Rhodes*, 423 F.2d 706, 706-07 (6th Cir. 1970)).  "The question is 'whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'"  *Super Tire Engineering Co. v. McCorkle*, 416 U.S. 115, 122 (1974) (quoting *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).

DIBC argues that the United States has presented a "hypothetical controversy," and that the United States is "attacking a decision of the Michigan Supreme Court that has absolutely no effect upon the acts, conduct, rights or privileges of the [United States], but directly affects the State of Michigan and its political subdivisions."  (DIBC's

2/26/10 Mot. Br. at 14.)  DIBC contends that a declaration regarding its status as a federal instrumentality will not "in any manner affect the conduct between DIBC and the [United States].  DIBC has not asserted its status as a federal instrumentality as a defense to any actual or threatened action by the [United States] nor has it used its status as a means to obligate or make the [United States] liable in any way." (*Id.* at 14-15.)  DIBC further argues that the United States "has not identified any action taken against DIBC that would be affected in any manner by a declaration by this [c]ourt that DIBC is or is not a federal instrumentality." (*Id.* at 15.)

In response, the United States argues that federal jurisdiction exists because the determination of whether an entity is a federal instrumentality presents a federal question.   This argument, however, addresses whether subject matter jurisdiction exists generally, not to whether the United States has asserted an actual and immediate controversy sufficient to invoke the protection of the Declaratory Judgment Act.  To that end, the United States also argues that a justiciable controversy exists because if DIBC is an instrumentality of the United States, and DIBC "deprived private landowners like Commodities of their property rights without compensation, as alleged here, then such landowners would have a claim against the federal government." (Gov't 3/18/10 Resp at 6.)   In support of this position, the United States cites cases in which courts have held that federal instrumentalities are capable of actions attributable to the federal government.

In *Lebron v. National R.R. Passenger Corp.*, 513 U.S. 374 (1995), the Supreme Court held that the federal government could not avoid its constitutional obligations by creating a "private" company to act in its stead.  The Court reasoned:

> That Government-created and -controlled corporations are (for many purposes at least) part of the Government itself has a strong basis, not merely in past practice and understanding, but in reason itself. It surely cannot be that government, state or federal, is able to evade the most solemn obligations imposed in the Constitution by simply resorting to the corporate form. On that thesis, *Plessy v. Ferguson*, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896), can be resurrected by the simple device of having the State of Louisiana operate segregated trains through a state-owned Amtrak. In *Pennsylvania v. Board of Directors of City Trusts of Philadelphia*, 353 U.S. 230, 77 S.Ct. 806, 1 L.Ed.2d 792 (1957) (per curiam), we held that Girard College, which had been built and maintained pursuant to a privately erected trust, was nevertheless a governmental actor for constitutional purposes because it was operated and controlled by a board of state appointees, which was itself a state agency. *Id.*, at 231, 77 S.Ct., at 806.

*Id.* at 397. The Court held that "where . . . the Government creates a corporation by special law, for the furtherance of governmental objectives, and retains for itself permanent authority to appoint a majority of the directors of that corporation, the corporation is part of the Government for purposes of the First Amendment." *Id.* at 400.

The United States also cites two cases in which the federal government was sued for the alleged wrongdoing of a federal instrumentality. (*See* Gov't 3/18/10 Resp at 6 (citing *L'Enfant Plaza Properties, Inc. v. United States*, 3 Cl.Ct. 582, 585 (Cl.Ct.1983).) In *L'Enfant Plaza,* defendant United States had moved to dismiss on grounds that the court lacked jurisdiction because RLA was not a federal instrumentality. The trial court, however, held that RLA was a federal instrumentality, *L'Enfant Plaza Properties, Inc. v. United States,* 209 Ct.Cl. 727 (1976), and trial ensued in which the court held that leases were breached by RLA and that the United States was liable for the damages thereby incurred. The United States also cites *Breitbeck v. United States*, 500 F.2d 556 (Ct.Cl. 1974), in which the court found that it was

> clear that action here is not precluded by the mere fact that the [defendant] entity is a wholly-owned federal corporation which is itself

suable in some other court. *The critical questions,* as formulated in Butz Engineering, *are, first, whether the organization is functioning as an instrumentality of the Federal Government,* and, second, whether the Government can demonstrate some special reason why this court is without jurisdiction, even though the agency is a federal instrument, to hear the claim.

*Breitbeck v. United States*, 500 F.2d at 558 (emphasis added).

In light of this authority, the court finds that the United States has sufficiently identified a justiciable controversy for purposes of seeking a declaratory judgment concerning DIBC's activities relative to Plaintiff's property. The United States contends, and the court agrees, that in the event DIBC is a federal instrumentality, DIBC's actions could expose the United States to liability. Specifically, as relates to this action, if DIBC's actions, taken as a purported federal instrumentality, resulted in an unlawful, uncompensated taking of Plaintiff's property, the United States could be held liable to Plaintiff.[3] This controversy is of "sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Super Tire Engineering Co.*, 416 U.S. at 122.

## 2. Jurisdiction and the Rooker-Feldman Doctrine

DIBC next argues that "this court has no jurisdiction to make any declaration about the finding of the Michigan Supreme Court at all, and especially when there are no federal interests are at issue." (DIBC Mot. Br. at 16.) Specifically, DIBC contends that the United States "seeks a declaratory judgment by collateral attacking the Michigan Supreme Court's decision and the subsequently issued Permanent Injunction

---

[3]Similarly, in a post-hearing brief filed by the City of Detroit, the City contends that if this court were to accept an argument made by DIBC that the federal government authorized DIBC to take control of the City's public streets, then the City would, in turn, assert a Fifth Amendment takings claim against the federal government. (*See* City's May 5, 2010 Supp. Br. at 2-3, n.3.)

[and s]uch review is barred by a practical application of the principles underlying the *Rooker-Feldman* doctrine." (*Id.*)

The *Rooker-Feldman* doctrine originated in two Supreme Court cases, *Rooker-Fidelity Trust Co.*, 263 U.S. 413 (1923) and *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462 (1983). The doctrine holds that lower federal courts do not have jurisdiction to review challenges to state court decisions, because such reviews may only be had in the Supreme Court pursuant to 28 U.S.C. § 1257. *Tropf v. Fidelity Nat. Title Ins. Co.*, 289 F.3d 929, 936 (6th Cir. 2002).

The Supreme Court reaffirmed and clarified the doctrine in *Exxon Mobil Corporation v. Saudi Basic Indus. Corp.*, 540 U.S. 280 (2005), holding that the doctrine applies to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." 540 U.S. at 284. The Supreme Court, however, also stated that even if "a federal plaintiff 'present[s] some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party," jurisdiction still exists. *Id.* at 293 (quoting *GASH Assocs. v. Rosemont*, 995 F.2d 726, 728 (7th Cir. 1993)).

"In the wake of *Exxon*, [the Sixth Circuit] has tightened the scope of *Rooker-Feldman*." *Pittman v. Cuyahoga County Dep't of Children and Family Servs.*, 241 F. App'x 285, 287 (6th Cir. 2007) (citing *Coles v. Granville*, 448 F.3d 853, 857 (6th Cir. 2006) ("*Rooker -Feldman* is a doctrine with only limited application.")). The Sixth Circuit has interpreted *Exxon*'s "limitation to mean that the *Rooker-Feldman* doctrine applies only when a plaintiff complains of injury from the state-court judgment itself." *Carter v.*

*Burns*, 524 F.3d 796, 798 (6th Cir. 2008).  "The pertinent inquiry after Exxon is the

'source of the injury' the plaintiff alleges in the federal complaint."  *In re Smith,* 349 F.

App'x 12, 14 (6th Cir. 2009) (citing *McCormick v. Braverman*, 451 F.3d 382, 393 (6th

Cir. 2006)).

> If the source of the injury is the state court decision, then the *Rooker-Feldman* doctrine would prevent the district court from asserting jurisdiction.  If there is some other source of the injury, such as a third party's actions, then the plaintiff asserts an independent claim.

*McCormick*, F.3d at 393.  As explained by the Sixth Circuit:

> The *Rooker-Feldman* doctrine embodies the notion that appellate review of state court decisions and the validity of state judicial proceedings is limited to the Supreme Court under 28 U.S.C. § 1257, and thus that federal district courts lack jurisdiction to review such matters. *See Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 291, 125 S.Ct. 1517, 161 L.Ed.2d 454 (2005) ("[T]his Court's appellate jurisdiction over state-court judgments ... precludes a United States district court from exercising subject-matter jurisdiction."); *Lawrence v. Welch*, 531 F.3d 364, 368 (6th Cir.2008) ("The *Rooker-Feldman* doctrine is based on the negative inference that, if appellate court review of such state judgments is vested in the Supreme Court, then it follows that such review may not be had in the lower federal courts.").  The *Rooker-Feldman* doctrine applies in those circumstances where a party initiates an action in federal district court "complaining of an injury caused by the state-court judgment and seeking review and rejection of that judgment."  *Exxon Mobil*, 544 U.S. at 291, 125 S.Ct. 1517 (emphasis added).

*In re Cook*, 551 F.3d 542, 548 (6th Cir. 2009).

There are, however, limits to the doctrine.  For example, the doctrine does not

apply to bar a suit when there is parallel state and federal litigation nor, in such

situations, is *Rooker-Feldman* "triggered simply by the entry of judgment in state court."

*Exxon Mobil Corp.,* 544 U.S. at 292. "Disposition of the federal action, once the state-court adjudication is complete, would be governed by preclusion law." *Id.* at 293.[4] Further, under the *Rooker-Feldman* doctrine, 28 U.S.C. § 1257 does not "stop a district court from exercising subject-matter jurisdiction simply because a party attempts to litigate in federal court a matter previously litigated in state court." *Id.* ("If a federal plaintiff 'present[s] some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party . . . , then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion.'") (quoting *GASH Assocs. v. Rosemont*, 995 F.2d 726, 728 (7th Cir. 1993)).

More directly applicable to this case, however, the Sixth Circuit has definitively held that "[t]he *Rooker-Feldman* doctrine does not apply to bar a suit in federal court brought by a party that was not a party in the preceding action in state court." *United States v. Owens*, 54 F.3d 271, 274 (6th Cir. 1995) (citing *Valenti v. Mitchell*, 962 F.2d 288 (3rd Cir. 1992)). This is because "[c]learly, a party cannot be said to be appealing a decision by a state court when it was not a party to the case." *Id.* Additionally, "the doctrine may not bar a party against whom there is no state court judgment." *Id.* (citing *Leaf v. Supreme Court of Wisconsin*, 979 F.2d 589 (7th Cir.1992)).

The Michigan Supreme Court case was filed by the City of Detroit against DIBC. While both of those parties are also parties to the instant litigation, the doctrine cannot be asserted against Plaintiff or against the United States, as they were not parties to the

---

[4]Issue preclusion, unlike the *Rooker-Feldman* doctrine, is not a jurisdictional issue. *Exxon Mobil Corp.,* 544 U.S. at 293. "In parallel litigation, a federal court may be bound to recognize the claim- and issue-preclusive effects of a state-court judgment, but federal jurisdiction over an action does not terminate automatically on the entry of judgment in the state court." *Id.*

prior litigation. *Owens*, 54 F.3d at 274. Moreover, although both Plaintiff and the United States challenge the holding of the Michigan Supreme Court, they cannot be said to be "state-court losers" of the prior litigation, as they were not parties of that litigation. The "*Rooker-Feldman* doctrine could not apply to parties that were not present in the state-court litigation." *Pieper v. Am. Arbitration Ass'n, Inc.*, 336 F.3d 458, 463 n.4 (6th Cir. 2003) (citing *Owens*, 54 F.3d at 274).

The court rejects as frivolous DIBC's argument that Plaintiff, as a "citizen"[5] of the City of Detroit, is necessarily in privity with the City and is therefore precluded by the principles underlying *Rooker-Feldman* because the City was a party to the prior litigation. DIBC relies on preclusion law as support for this argument (*see* DIBC's Mot. Br. at 5-6), but as stated above, preclusion is an issue separate from the *Rooker-Feldman* doctrine. DIBC cites *Lance v. Dennis*, 546 U.S. 459 (2006) for the proposition that one of the requirements of the *Rooker-Feldman* doctrine is that "the party against whom the doctrine is invoked must have actually been a party to the prior state-court judgment or have been in privity with such a party." *Id.* at 462 (quoting *Lance v. Davidson*, 379 F.Supp.2d 1117, 1124 (2005)). DIBC accurately quotes those certain words from the Court's opinion in *Lance*, but the cited material comes from the Court's recitation of the *district court* opinion which the Court then proceeded to vacate. The

---

[5] Plaintiff is not a "citizen" of Detroit in privity with the City of Detroit simply because it is a Michigan corporation that operates in the City of Detroit. Contrary to DIBC's arguments, Plaintiff asserts wrongs distinct from those felt by every taxpayer in the City of Detroit related to the alleged actions restricting or preventing the use of Plaintiff's property. Moreover, as Plaintiff points out, Plaintiff appears to be a "citizen" of Clinton Township, Michigan, if anywhere, as it is there that Plaintiff maintains its registered office. (Pl.'s Resp. at 6.) In addition, there can be no cogent argument that the United States is in privity with the City of Detroit.

Court's opinion at that point focused on the district court's *mistake* in finding that the

*Rooker-Feldman* doctrine applied to privies. The Court explained:

> In the case before us, the plaintiffs were plainly not parties to the underlying state-court proceeding in *Salazar*. *Salazar* was an action brought by the state attorney general against the secretary of state, in which the Colorado General Assembly intervened. 79 P.3d, at 1227. The four citizen-plaintiffs here did not participate in Salazar, and were not in a "position to ask this Court to review the state court's judgment." *De Grandy*, *supra*, at 1006, 114 S.Ct. 2647; *see Karcher v. May*, 484 U.S. 72, 77, 108 S.Ct. 388, 98 L.Ed.2d 327 (1987) ("[T]he general rule [is] that one who is not a party or has not been treated as a party to a judgment has no right to appeal therefrom").

> Although the District Court recognized the "general rule" that " *Rooker-Feldman* may not be invoked against a federal-court plaintiff who was not actually a party to the prior state-court judgment," 379 F.Supp.2d, at 1123, it nevertheless followed Tenth Circuit precedent in allowing application of *Rooker-Feldman* against parties who were in privity with a party to the earlier state-court action, 379 F.Supp.2d, at 1123 (citing *Kenmen Eng. v. Union*, 314 F.3d 468, 481 (2002)). In determining whether privity existed, the court looked to cases concerning the preclusive effect that state courts are required to give federal-court judgments. 379 F.Supp.2d, at 1125 (citing *Washington*, 443 U.S., at 693, n. 32, 99 S.Ct. 3055; *Taxpayers of Tacoma*, 357 U.S., at 340-341, 78 S.Ct. 1209). It concluded that-for *Rooker-Feldman* as well as preclusion purposes-"the outcome of the government's litigation over a matter of public concern binds its citizens." 379 F.Supp.2d, at 1125.

*Lance*, 546 U.S. at 465. The Court specifically rejected the insertion of preclusion law

into the *Rooker-Feldman* doctrine:

> The District Court erroneously conflated preclusion law with *Rooker-Feldman*. Whatever the impact of privity principles on preclusion rules, *Rooker-Feldman* is not simply preclusion by another name. The doctrine applies only in "limited circumstances," *Exxon Mobil*, supra, at 291, 125 S.Ct. 1517, where a party in effect seeks to take an appeal of an unfavorable state-court decision to a lower federal court. The *Rooker-Feldman* doctrine does not bar actions by nonparties to the earlier state-court judgment simply because, for purposes of preclusion law, they could be considered in privity with a party to the judgment.

> A more expansive Rooker-Feldman rule would tend to supplant Congress' mandate, under the Full Faith and Credit Act, 28 U.S.C. § 1738, that

federal courts "'give the same preclusive effect to state court judgments that those judgments would be given in the courts of the State from which the judgments emerged.'" *Baker v. General Motors Corp.*, 522 U.S. 222, 246, 118 S.Ct. 657, 139 L.Ed.2d 580 (1998) (quoting *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 466, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982)); see *Exxon Mobil, supra*, at 293, 125 S.Ct. 1517. Congress has directed federal courts to look principally to state law in deciding what effect to give state-court judgments. Incorporation of preclusion principles into *Rooker-Feldman* risks turning that limited doctrine into a uniform federal rule governing the preclusive effect of state-court judgments, contrary to the Full Faith and Credit Act.

*Id.* at 466 (footnote omitted). The Supreme Court rejected the very argument now asserted by DIBC, *i.e.*, that the *Rooker-Feldman* doctrine applies to bar an action by the privies of the parties from the prior litigation. The Supreme Court has spoken clearly on this issue. DIBC's argument fails.[6]

---

[6]Further, to the extent DIBC relies on any theory of preclusion, the court finds such reliance misplaced. Under Michigan law, the doctrine of res judicata bars a subsequent action when "(1) the first action was decided on the merits, (2) the matter contested in the second action was or could have been resolved in the first, and (3) both actions involve the same parties or their privies." *Estes v. Titus*, 751 N.W.2d 493, 499 (Mich. 2008) (quoting *Dart v. Dart,* 597 N.W.2d 82 (Mich. 1999)). Similarly, the doctrine of collateral estoppel "bars relitigation of an issue in a new action arising between the same parties or their privies when the earlier proceeding resulted in a valid final judgment and the issue in question was actually and necessarily determined in that prior proceeding." *Leahy v. Orion Township*, 711 N.W.2d 438, 441 (Mich. Ct. App. 2006) (per curiam). Because the court is unconvinced that either Plaintiff or the United States is a privy of the City of Detroit, the doctrines of res judicata and collateral estoppel do not apply. Likewise, the court also finds that the *Younger* abstention doctrine does not apply, because Plaintiff and the United States are neither parties nor even privies to the Michigan Supreme Court injunction. *See Gottfried v. Medical Planning Services, Inc.*, 142 F.3d 326, 329 (6th Cir. 1998) ("One could argue that the ongoing injunction is the equivalent of a pending state court action for purposes of *Younger* abstention. Yet that argument only holds if the federal plaintiff is a party to the state court's injunction. As with the Anti-Injunction Act and the rules of preclusion, *Younger* abstention cannot apply to one like Gottfried who is a stranger to the state proceeding." (citations omitted)).

### 3. Agency Relationship

DIBC next asserts that Plaintiff's claims against the United States rely on agency law, as distinct from the law related to federal instrumentalities. There appears to be no dispute among the parties that DIBC is not an agent of the United States. DIBC argues that, even if it is a federal instrumentality, this status does not subject the United States to any liability for DIBC's actions. As explained above, however, the Government has identified exemplar cases in which the United States was sued for the actions of an entity determined to have been a federal instrumentality. Plaintiff's claims against the United States are potentially viable, contingent upon the legitimacy of DIBC's status as instrumentality. DIBC's argument is therefore rejected. Because DIBC has failed to show that the Government's cross claim fails as a matter of law, its motion for summary judgment will be denied.

### B. The Government's Motion

The Government has filed its own motion for summary judgment on the federal instrumentality issue. Specifically, the Government moves that the court "declare that DIBC is not a federal instrumentality and enjoin DIBC from misrepresenting that it is such an arm of the federal government." (Gov't's Mot. Br. at 2.) The Government also asks that the court thereafter dismiss the United States from this lawsuit. (*Id.*) The Government's motion is focused principally on seeking a general declaration that the DIBC is not a federal instrumentality. The court, however, examines the federal instrumentality question within the facts of this case, arising as they do out of DIBC's actions with respect to Plaintiff's property rights.

"It is long established that any state or local law which attempts to impede or control the federal government or its instrumentalities is deemed presumptively invalid under the Supremacy Clause." *Augustine v. Department of Veterans Affairs*, 429 F.3d 1334, 1339 (Fed. Cir. 2005) (citing *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 189-90 (1956); *Johnson v. Maryland*, 254 U.S. 51, 57 (1920); *McCulloch v. Maryland*, 17 U.S. 316, 429-430 (1819); *Mount Olivet Cemetery Ass'n. v. Salt Lake City*, 164 F.3d 480, 486 (10th Cir. 1998); *Don't Tear It Down, Inc. v. Pa. Ave. Dev. Corp.*, 642 F.2d 527, 534-35 (D.C.Cir.1980)).

In its motion and supporting brief, the Government sets forth an accurate and comprehensive history of federal instrumentalities. Indeed, both parties have identified numerous cases discussing, in varying terms of specificity, the meaning and purpose of federal instrumentalities. The principle of federal instrumentality immunity arose in *McCulloch v. Maryland*, 17 U.S. 316 (1819), in which the Supreme Court established the doctrine of federal immunity from state taxation. As later explained by the Sixth Circuit:

> In that case, the Court held that, absent Congressional consent, the federal government and its instrumentalities are immune from state taxation under the Supremacy Clause of the Constitution. *Id.* Congress clearly has not consented to state taxation of federal credit unions; to the contrary, Congress has expressly prohibited state taxation of federal credit unions, except for ad valorem taxation of real and personal property. 12 U.S.C. § 1768. Therefore, if federal credit unions are federal instrumentalities, they are entitled to constitutional, as well as, statutory, immunity from state taxation.

*United States of America v. State of Mich.,* 851 F.2d 803, 805-06 (6th Cir. 1988) (footnote omitted).

Justice White, dissenting in *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174,

succinctly set forth the rationale behind federal instrumentality immunity:

> The Court's seminal decision in *McCulloch v. Maryland*, 4 Wheat. 316, 4
> L.Ed. 579 (1819), establishes the principle that the States may not
> exercise their sovereign powers so as to control those instrumentalities of
> the United States which have been judged necessary and proper to carry
> into effect federal laws and policies. Although the narrow issue in that
> case involved only the assertion by the State of Maryland of its power to
> tax a federal bank, the Court laid down a more general construction of the
> Supremacy Clause that has proved to be enduring in its force of reason.
> As the Court stated: "The attempt to use [state sovereign power] on the
> means employed by the government of the Union, in pursuance of the
> constitution, is itself an abuse, because it is the usurpation of a power
> which the people of a single State cannot give." *Id.* at 430. The contrary
> principle would be "capable of arresting all the measures of the
> government, and of prostrating it at the foot of the States. The American
> people have declared their constitution, and the laws made in pursuance
> thereof, to be supreme; but this principle would transfer the supremacy, in
> fact, to the States." *Id.* at 432. "The result," the Court concluded, "is a
> conviction that the States have no power, by taxation or otherwise, to
> retard, impede, burden, or in any manner control, the operations of the
> constitutional laws enacted by Congress to carry into execution the
> powers vested in the general government." *Id.* at 436 (emphasis added).

> Although, again, the narrow issue in *McCulloch* concerned only the power
> to tax, which as the Court noted "involves the power to destroy," id., at
> 431, the passages quoted above demonstrate that the decision was
> formulated, explicitly, with sufficient breadth to apply to other measures a
> State might impose that would "retard, impede, burden, or in any manner
> control" the operations of federal instrumentalities. *Id.* at 436. And,
> clearly, the power to regulate also involves "the power to destroy" if the
> regulatory web is spun too tightly around its object. More commonly,
> however, the additional and perhaps conflicting regulations imposed by a
> State would simply burden the federal instrumentality, interfere with its
> operations, and frustrate the federal objectives it is designed to achieve.
> Nonetheless, the law has long been settled that such regulation cannot be
> imposed on federal instrumentalities by the States, under the Supremacy
> Clause, unless the Federal Government directly indicates that it finds such
> impositions to be consistent with the proper pursuit of its powers under
> federal law. *Hancock v. Train*, 426 U.S. 167, 178-179, 96 S.Ct. 2006,
> 2012-2013, 48 L.Ed.2d 555 (1976); *Mayo v. United States*, 319 U.S. 441,
> 447-448, 63 S.Ct. 1137, 1140-1141, 87 L.Ed. 1504 (1943).

*Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 186-188 (1988) (White, J., dissenting).

As both parties acknowledge, there is no bright line test or rule to identify a federal instrumentality. *Augustine*, 429 F.3d at 1339; *see also Dep't of Employment*, 385 U.S. at 358-59 ("There is no simple test for ascertaining whether an institution is so closely related to governmental activity as to become a tax-immune instrumentality."). Instead, "the Supreme Court has looked to several factors, including: whether the entity was created by the government; whether it was established to pursue governmental objectives; whether government officials handle and control its operations; and whether the officers of the entity are appointed by the government." *Augustine*, 429 F.3d at 1339 n.3 (citing *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 397-98 (1995)). The Sixth Circuit similarly has stated that "[t]he leading cases suggest that we examine the purpose for which federal credit unions were created, that we determine whether they continue to perform that function, and that we assess the federal government's control over and involvement with these organizations." *State of Mich.*, 851 F.2d at 806. Further, "[o]ne significant factor in determining whether a particular entity is a federal instrumentality is whether it performs an important governmental function." *Id.* (citing *Federal Land Bank v. Bismarck Lumber Co.*, 314 U.S. 95, 62 S.Ct. 1, 86 L.Ed. 65 (1941)).

For example, in situations addressing state taxation of contractors conducting business with the United States, "an instrumentality is entitled to implied tax immunity only when it is 'so closely connected to the Government that the two cannot realistically be viewed as separate entities.'" *Director of Revenue of Missouri v. CoBank ACB*, 531 U.S. 316, 321 (2001) (quoting *United States v. New Mexico*, 455 U.S. 720, 735 (1982).

In addressing the distinction between Conrail, which is not a federal instrumentality, and

Amtrack, which is, the Supreme Court explained:

> Respondent also invokes our decision in the *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974), which found the Consolidated Rail Corporation, or Conrail, not to be a federal instrumentality, despite the President's power to appoint, directly or indirectly, 8 of its 15 directors. *See id.*, at 152, n. 40, 95 S.Ct., at 363, n. 40; Regional Rail Reorganization Act of 1973, § 301, 87 Stat. 1004. But we specifically observed in that case that the directors were placed on the board to protect the United States' interest "in assuring payment of the obligations guaranteed by the United States," and that "[f]ull voting control . . . will shift to the shareholders if federal obligations fall below 50% of Conrail's indebtedness." 419 U.S., at 152, 95 S.Ct., at 363. Moreover, we noted, "[t]he responsibilities of the federal directors are not different from those of the other directors-to operate Conrail at a profit for the benefit of its shareholders," *ibid.*-which contrasts with the public interest "goals" set forth in Amtrak's charter, *see* 45 U.S.C. § 501a. Amtrak is worlds apart from Conrail: The Government exerts its control not as a creditor but as a policymaker, and no provision exists that will automatically terminate control upon termination of a temporary financial interest.

*Lebron v. National R.R. Passenger Corp.,* 513 U.S. 374, 399 (1995). Likewise, the

Supreme Court has held that the Red Cross is a federal instrumentality due to the

degree of control the United States maintains over its operations:

> On the merits, we hold that the Red Cross is an instrumentality of the United States for purposes of immunity from state taxation levied on its operations, and that this immunity has not been waived by congressional enactment. Although there is no simple test for ascertaining whether an institution is so closely related to governmental activity as to become a tax-immune instrumentality, the Red Cross is clearly such an instrumentality. *See generally*, Sturges, The Legal Status of the Red Cross, 56 Mich.L.Rev. 1 (1957). Congress chartered the present Red Cross in 1905, subjecting it to governmental supervision and to a regular financial audit by the Defense, then War, Department. 33 Stat. 599, as amended, 36 U.S.C. s 1 et seq. Its principal officer is appointed by the President, who also appoints seven (all government officers) of the remaining 49 Governors. 33 Stat. 601, as amended, 36 U.S.C. § 5. By statute and Executive Order there devolved upon the Red Cross the right and the obligation to meet this Nation's commitments under various Geneva Conventions, to perform a wide variety of functions indispensable to the workings of our Armed Forces around the globe, and to assist the

Federal Government in providing disaster assistance to the States in time
of need.  Although its operations are financed primarily from voluntary
private contributions, the Red Cross does receive substantial material
assistance from the Federal Government.  And time and time again, both
the President and the Congress have recognized and acted in reliance
upon the Red Cross' status virtually as an arm of the Government.  In
those respects in which the Red Cross differs from the usual government
agency-e.g., in that its employees are not employees of the United States,
and that government officials do not direct its everyday affairs-the Red
Cross is like other institutions-e.g., national banks-whose status as
tax-immune instrumentalities of the United States is beyond dispute.

*Department of Employment v. United States*, 385 U.S. 355, 358-360 (1966) (footnotes

omitted).

Consistent with these principles, and the various, additional cases addressing

federal instrumentality status, the Government proposes eight features which Supreme

Court jurisprudence accepts as relevant in holding an entity to be a federal

instrumentality:

(1) it performs governmental functions;
(2) government officials thoroughly control its operations;
(3) it would be deemed a servant under the law of agency;
(4) its officers are appointed by the President or other high government
official;
(5) it is not organized for profit or to perform commercial
activities;
(6) it is created by federal statute;
(7) the government owns it or it is supported by the government, which
carries its profits and losses; and
(8) it is considered by Congress and the President to be an arm of the
federal government.

(Gov't Mot. Br. at 9.)  While the court does not generally disagree with any of these

factors, the court also does not understand this to be an exhaustive, or mandatory list of

factors to consider.  Essentially, the question is a fact-based determination examining

the degree of control or involvement the federal government has exercised over the

creation, operation, control, and function of the entity. *Augustine*, 429 F.3d at 1339 n.3;

*State of Mich.*, 851 F.2d at 806.

In its summary judgment brief, the Government argues that there is no issue of

fact that DIBC cannot qualify as a federal instrumentality. The Government proffers the

following factual observations:

> The government does not own DIBC, or hold its stock, or bear its gains or
> losses. DIBC is, again, a privately incorporated, for-profit company
> engaged in commercial enterprises. It was not created by a federal
> statute and does not owe its existence to Congress. Its corporate officers
> are not appointed by the President of the United States. Nor are its
> officers or board members otherwise answerable to government officials.
> Likewise, government officials do not dictate or control the company's
> operations. Nor is the company perceived by Congress or the President,
> or any federal agency, to be an extension of the federal government. Last
> but not least–and as a reflection of the above–DIBC does not perform any
> important governmental function. Rather, it is engaged in proprietary
> activity for its own benefit.

(Gov't Mot. Br. at 10-11.) The Government suggests that due to these undisputed

facts, the court should find as a matter of law that DIBC is not a federal instrumentality.

In support of its motion the Government has submitted DIBC's Articles of

Incorporation to show that DIBC is a private, state-chartered, for-profit corporation.

(*See* Gov't's Ex. 1.) The Government has also submitted the affidavit of Hala Elgaaly,

the Administrator of the United States Coast Guard Bridge Program at Coast Guard

Headquarters in Washington, D.C. Elgaaly states, "To the best of my knowledge and

information, my staff and I have never stated, implied or suggested that DIBC holds any

federal agency powers. Neither I nor my staff have ever delegated or directed DIBC to

act on behalf of the Coast Guard as a federal agency." (Elgaaly Aff. at ¶ 2, Gov't.'s Ex.

2.) Elgaaly continues, "I have . . . notified DIBC that the Coast Guard has not issued a

Bridge permit on the [Ambassador Bridge Enhancement Project ("ABEP")], hence any

construction they may have started on the ABEP, is construction by a private entity without the required federal permit." (*Id.* at ¶ 3.) Attached to Elgaaly's affidavit is a letter in which Elgaaly requests DIBC to show cause why its construction of the new Ambassador Bridge is not in violation of various federal statutes and regulations. (*Id.*)

The Government has also submitted an affidavit of Donald Melcher, who is a Project Manager in the General Services Administration's ("GSA's") Great Lakes Region. Melcher states that "DIBC is not an arm of the Federal Government, nor has it ever been. At no time has anyone representing or working for DIBC represented the interests of GSA." (Melcher Aff. at ¶ 2, Gov't.'s Ex. 3.) Melcher then proceeds to list six examples of DIBC's actions which were either in direct contravention of the expressed direction of GSA, or at least antithetical to GSA's interests. (*Id.*)

Finally, the Government relies on the affidavit of James Steele, the Michigan Division Administrator of the Federal Highway Administration. (Steele Aff., Gov't.'s Ex. 4.) Mr. Steele avers that to the best of his knowledge and information "no one from the Federal Highway Administration has ever stated or implied that [DIBC] holds or exercises any federal powers. Nor has the Federal Highway Administration delegated power to [DIBC], or authorized the Company to act on the agency's behalf." (*Id.* at ¶ 2.) He also states that "[n]o other federal agency that I am aware of has delegated federal powers to the [DIBC], and I am not aware that the company exercises any federal powers." (*Id.* at ¶ 3.) Steele concludes that, rather than exercising any such power, DIBC in fact "has interests adverse to the Federal Highway Administration. [DIBC] and the [Federal Highway Administration] are currently in litigation, as is [DIBC] and other federal agencies." (*Id.* at ¶ 4.)

DIBC does not specifically dispute these facts, but instead argues that the federal instrumentality issue is not appropriately decided on summary judgment.[7]  Without specifically identifying which facts are in dispute, DIBC argues that the court should accept "the extensive factual findings of the Wayne County Circuit Court adduced from extensive testimony provided by, among others, federal government witnesses who strained mightily to support the City's position."  (DIBC's Resp. Br. at 3.)  Indeed, the bulk of DIBC's brief focuses on the facts and holdings of the prior litigation, all but ignoring the terms of the present litigation.  As discussed above, this litigation is not precluded by the previous litigation.  Nor has any party shown that the doctrines of res judicata or collateral estoppel mandate any particular holding or conclusion.  The opinion of the Michigan Supreme Court is, at most, persuasive authority, but is certainly nonbinding on this court.[8]

---

[7]DIBC's primary argument is that the court should not address this issue at all, for the reasons stated in DIBC's motion for summary judgment.  The court, of course, has rejected DIBC's arguments that the federal instrumentality issue is not cognizable here.

[8]Similarly, the court accepts as persuasive the two United States Supreme Court cases which held that the predecessor to DIBC was not exempt from paying a state tax. *See Detroit International Bridge Co. v. Corporation Tax Appeal Board of State of Michigan*, 294 U.S. 83, 85-86 (1935); *Detroit International Bridge Co. v. Corporation Tax Appeal Board*, 287 U.S. 295, 298 (1932).  The Court held that DIBC was not engaged in interstate commerce and thus it did not offend the United States Constitution to impose a state tax on what was essentially a state business. *Detroit International Bridge Co.*, 287 U.S. at 298 ("The record discloses that the appellant owns, maintains, and operates a bridge between Michigan and Canada across the Detroit river; that for passing over this it demands and collects tolls from vehicles and pedestrians. It 'conveys no persons or goods across the international boundary line. It merely collects tolls from such persons as use it (the bridge). It provides an instrumentality which others may use in conducting foreign commerce.'").  While this holding is relevant to the court's discussion, it is not identical;  the Court's holding does not conclusively determine the outcome of this case.  Nonetheless, it bears noting that the Supreme Court, when faced with a similar question, held that DIBC was not exempt from state taxation.

Because DIBC focused solely on making legal arguments, without attacking or disputing the Government's proposed facts, the court is unable to find a genuine issue of material fact sufficient for this case to proceed to trial. Under well-known summary judgment standards, the moving party discharges its burden by "'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Horton v. Potter,* 369 F.3d 906, 909 (2004) (citing *Celotex*, 477 U.S. at 325).

When, as here, "the moving party bears the burden of persuasion on the issue at trial, its showing must sustain that burden as well as demonstrate the absence of a genuine dispute." William W. Schwarzer, et al., *The Analysis and Decision of Summary Judgment Motions*, 139 F.R.D. 441, 477 (1992) (footnote omitted); *see also Wells Fargo Bank, NA v. MPC Investors, LLC,* — F. Supp. 2d. —, 2010 WL 1499291, *5 (E.D. Mich. Apr. 9, 2010) ("When the moving party also bears the ultimate burden of persuasion, the movant's affidavits and other evidence not only must show the absence of a material fact issue, they also must carry that burden."). "Thus, it must satisfy both the initial burden of production on the summary judgment motion-by showing that no genuine dispute exists as to any material fact-and the ultimate burden of persuasion on the claim-by showing that it would be entitled to a directed verdict at trial." Schwarzer, 139 F.R.D. at 477-478 (footnote omitted).

The court finds that the Government has carried its initial burden, under Federal Rule of Civil Procedure 56(a) of showing that the evidence submitted to the court entitles it to a judgment on the federal instrumentality issue. The Government has pointed to sufficient facts that show that DIBC is a private company which, although it

facilitates the flow of vehicular traffic –and, in turn, interstate commerce– is engaged in a private business.  From the limited facts before the court, the only conclusion to be drawn is that the federal government maintains very little control or involvement in DIBC's operations.[9]   *Augustine*, 429 F.3d at 1339 n.3 ("[T]he Supreme Court has looked to several factors, including: whether the entity was created by the government; whether it was established to pursue governmental objectives; whether government officials handle and control its operations; and whether the officers of the entity are appointed by the government.") (citation omitted).

With this the only possible conclusion under the Government's facts, the Rule 56 burden then shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co.*, 475 U.S. at 586; *see also Alexander v. CareSource,* 576 F.3d 551, 558 (6th Cir. 2009) ("Once that occurs, the party opposing the motion then may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion.") (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)).  This case appears to be one of those in which the non-moving party has done just what the Supreme Court and the Sixth Circuit cautioned against in *Matsushita* and *Street*.  DIBC has done nothing more than to *suggest* that facts may be in dispute.  DIBC argues that the court should deny the Government's motion because the determination of whether DIBC is a federal

---

[9]   The court recognizes that even the Government has proffered very few facts in this regard.  Nonetheless, the summary judgment standard is not based on quantity. The moving party need only point to enough evidence to show the absence of an issue of fact.

instrumentality is fact-based, and therefore not appropriate for summary judgment.

(DIBC's Resp. at 3.)  DIBC contends that the court should make a "thorough review of

the facts" and either "accept the extensive factual findings of the Wayne County Circuit

Court" (which has not been provided to this court) or hold "supplementary evidentiary

hearings."  (*Id.*)   It is well-established, however, that a party cannot avoid summary

judgment by merely suggesting that a factual dispute exists, without providing any

evidence on which to find a dispute.  This principle has long been known.  As aptly

stated in this district in a pre-*Matsushita* case more than thirty years ago,

> Plaintiff has responded to the facts as set forth and to the conclusion that
> can be drawn therefrom with the mere assertion that some unspecified
> proof, presumably to the contrary, will be forthcoming at trial. It is settled
> that in motions for summary judgment, the responding party must set forth
> its facts in the form of affidavits, depositions, exhibits and the like. It is only
> in this way that a 'genuine issue' is created, and a respondent cannot
> succeed by asserting that proof will be forthcoming at trial or by relying
> upon unsupported allegations or claims in the pleadings.

*Ann Arbor Trust Co. v. North Am. Co. for Life and Health Ins.*, 383 F. Supp. 310, 315

(E.D. Mich. 1974).  Indeed, "if the movant puts forward evidence-such as affidavits,

purported business records, purported government records, etc.-the other party cannot

withstand summary judgment by simply sitting mute and failing to challenge the

authenticity, admissibility, or veracity of those documents." *Leys v. Lowe's Home

Centers, Inc.*, 664 F.Supp.2d 828, 831 (W.D. Mich. 2009) (citing *Donoho v. Smith Cty.

Bd. of Ed.*, 21 F. App'x 293, 298 (6th Cir. 2001)).  DIBC is not entitled "to get to the jury

on the basis of the allegations in their [pleadings], coupled with the hope that something

can be developed at trial . . . ." *Smith v. Hudson,* 600 F.2d 60, 65 (6th Cir. 1979)

(quoting *First National Bank v. Cities Service*, 391 U.S. 253, 289-90 (1968)); *see also

Bryant v. Com. of Ky.,* 490 F.2d 1273, 1275 (6th Cir. 1974) ("[W]here the movant brings

forward and supports his motion for summary judgment, his opponent may not rest merely upon his pleadings but rather must come forward to show genuine issues of fact. Mere conclusory and unsupported allegations, rooted in speculation, do not meet that burden.").

DIBC has not put forth any evidence to dispute the Government's evidence. The sole affidavit attached to DIBC's brief relates primarily to whether the property in question is owned by the City of Detroit or has been abandoned. (DIBC's Resp. Br. at Ex. A.)

The only averments made with respect to DIBC's status as a federal instrumentality are found at paragraphs 14-17, in which the president of DIBC, Dan Stamper, avers that DIBC has never asserted that is "an appendage, agent, constituent, or servant" of a state, local or the federal government (*id.* at ¶¶ 14,15, 17)[10] and that DIBC does not claim to have taken any action of which Plaintiff complains based on its possible status as a federal instrumentality (*id.* at ¶ 16). These averments bolster, rather than contest, the Government's position.

Likewise, DIBC also submits the Government's responses to Plaintiff's request to admit, in which the Government makes the following admissions:

(1)     [T]he federal government did not create or authorize the creation of [DIBC] (the corporate entity, not the Ambassador Bridge itself) or its corporate predecessor.

(2)     [T]he federal government does not have any control of DIBC's articles of

---

[10]  This sworn statement appears to have been contradicted at oral argument by DIBC's counsel who affirmed several times that DIBC had "presented itself as a federal instrumentality" even before the Michigan Supreme Court issued its ruling to that effect.

incorporation, by-laws, or other corporate documents.

(3)    [T]he federal government does not own all or any part of DIBC.

(4)    [T]he federal government does not handle and control the operations of DIBC.

(5)    [T]he federal government does not appoint any of DIBC's officers.

(6)    [T]he federal government does not have any control of the hiring, firing or supervision of any of DIBC's employees or officers.

(7)    [T]he federal government does not fund DIBC's operations.

(8)    [T]he federal government does not have any control over DIBC's spending.

(9)    [T]he federal government does not receive any share of profits generated by DIBC's operations.

(10)    [T]he federal government does not bear any portion of losses resulting from DIBC's operations.

(11)    [T]he federal government is not liable for any judgments entered against DIBC.

(12)    [T]he federal government does not have any control over DIBC's policies or positions.

(13)    [T]he federal government does not have any control over lawsuits filed by DIBC or actions or positions taken by DIBC in litigation.

(14)    DIBC is not indispensable to the workings of any federal department or unit.

(15)    [T]he federal government does not have the power to dissolve DIBC.

(16)    DIBC does not perform any governmental function.

(17)    [N]o federal statute, regulation or guideline designates DIBC as a federal instrumentality or indicate that the federal government believes DIBC to be a federal instrumentality.

(18)    [N]o federal contract requires that DIBC seize, destroy and build upon 23rd Street in Detroit, Michigan, immediately north of Fort Street.

(19)    [N]o federal law requires that DIBC seize, destroy and build upon 23rd Street in Detroit, Michigan, immediately north of Fort Street.

(20)    [N]o federal policy or objective requires that DIBC seize, destroy and build upon 23rd Street in Detroit, Michigan, immediately north of Fort Street.

(DIBC Resp. at Ex. D.)  These admissions further support, in greater detail, the Government's motion.  The court is unclear as to why these statements would be submitted by DIBC and not the Government, they have nonetheless become part of the record before the court on summary judgment.  Considering this evidence, in addition to the evidence submitted by the Government, leaves the court with only one possible conclusion:  judgment must be entered in favor of the Government as a matter of law.

DIBC has identified no factual dispute for trial.  *Horton,* 369 F.3d at 909 (citing *Matsushita*, 475 U.S. at 587) (stating that the non-moving party "The failure to present any evidence to counter a well-supported motion for summary judgment alone is grounds for granting the motion."  *Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009) (citing *Skousen v. Brighton High School*, 305 F.3d 520, 528 (6th Cir. 2002)).   Not only has DIBC submitted no evidence that contradicts the Government's position, the evidence it did submit supports the Government's motion.  The court will grant the

Government's motion for summary judgment, declare that DIBC is not a federal instrumentality, and enjoin DIBC from claiming such status and potentially subjecting the United States to liability for DIBC's actions.[11]

## V. CONCLUSION

IT IS ORDERED that the United States's "Motion for Summary Judgment on 'Federal Instrumentality' Status of DIBC" [Dkt. # 55] is GRANTED and DIBC's "Motion for Summary Judgment" [Dkt. # 63] is DENIED.

IT IS FURTHER ORDERED that Government shall submit a proposed declaratory judgment and injunction, consistent with this order and closely tracking its Cross Claim within seven days of the date of this order.

 S/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  June 29, 2010

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, June 29, 2010, by electronic and/or ordinary mail.

 S/Lisa Wagner
Case Manager and Deputy Clerk
(313) 234-5522

S:\Cleland\JUDGE'S DESK\C3 ORDERS\09-11060.COMMODITIES.FederalInstrumentality.SJ.5.wpd

---

[11]In its post-hearing supplemental brief, DIBC argues that the use of the term "Federal" is not prohibited by law, absent circumstance not present here.  DIBC misses the point though.  The court is not enjoining DIBC based on the use of the word "Federal" in its name, but from claiming the *status* of a federal instrumentality, limited or otherwise, and from claiming that is exempt from state or local ordinances based upon that asserted status.