# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

COMMODITIES EXPORT COMPANY,

      Plaintiff/Counter-Defendant,

v.                            Case No. 09-CV-11060-DT

CITY OF DETROIT, UNITED STATES OF
AMERICA,

      Defendants/Cross-Defendants,

and

DETROIT INTERNATIONAL BRIDGE
COMPANY,

      Defendant/Counter-Plaintiff/Cross-
      Plaintiff/Third Party Plaintiff,

v.

WALTER LUBIENSKI and DEAN AYTES,

      Third Party Defendants.

_____/

## ORDER DISMISSING WITHOUT PREJUDICE PLAINTIFF'S STATE LAW CLAIMS AND DISMISSING WITHOUT PREJUDICE DIBC'S COUNTERCLAIM AND THIRD PARTY COMPLAINT

Approximately eighteen months ago, Plaintiff Commodities Export Company initiated this action against the United States of America and the City of Detroit. The case proceeded relatively uneventfully through discovery, with little court involvement. Following the close of discovery, however, the court allowed the Detroit International Bridge Company ("DIBC") to intervene in this action. In the next six months, the parties bombarded each other with motion after motion, challenging the court's subject matter jurisdiction, the quality of the pleadings, and the underlying factual assertions made

against one another.  On June 29, 2010, the court issued an opinion resolving the predominate federal question at issue in this litigation.  Currently pending before the court are motions challenging the remaining federal issues, the propriety of the state law claims, as well as the reasoning of the court in its June 29, 2010, opinion.  The court has thoroughly reviewed all the pending motions, as well as the many claims at issue in this lawsuit.  After careful consideration, the court concludes that it should not exercise supplemental jurisdiction over any of the state law claims in this lawsuit, and will therefore dismiss them without prejudice.

## I.  BACKGROUND

Plaintiff Commodities Export Company initiated this action on March 20, 2009, against Defendants the United States of America and the City of Detroit. Plaintiff later filed an amended complaint on May 1, 2009.  On December 21, 2009, following the conclusion of discovery, the court granted a motion to intervene filed by DIBC.  Thereafter, by stipulation, Plaintiff filed its "Second Amended Complaint."

DIBC filed a Counter-Complaint against Plaintiff, and a Third Party Complaint against Walter Lubienski and Dean Aytes.  On February 5, 2010, the United States filed a Cross Claim against DIBC.

### A.  Plaintiff's Claims

In its "Second Amended Complaint," Plaintiff alleges that it is the owner of property located at 3317-3325-3331 West Lafayette, Detroit, Michigan, in the immediate area of the international Ambassador Bridge.  (2nd Am. Compl. ¶ 2.)  Plaintiff further contends that Defendant City of Detroit is a Michigan municipal corporation with jurisdiction over streets and roads in the City of Detroit and specifically over 23rd Street

and W. Lafayette in the City of Detroit.  (2nd Am. Compl. ¶ 3.)  Defendant DIBC is a

for-profit Michigan business corporation which owns and operates the Ambassador

Bridge.  (2nd Am. Compl. ¶ 4.)

      According to the "Second Amended Complaint," sometime before November 27,

2008, contractors in the employ of DIBC removed and destroyed the roads (portions of

23rd Street and W. Lafayette) in front of and leading to Plaintiff's property.  (2nd Am.

Compl. ¶ 8.)  The property is currently rented and the tenants cannot conduct their

business, receive customers or obtain police or fire protection.  (2nd Am. Compl. ¶ 9.)

There are no known government-sanctioned plans for removing or abandoning

Lafayette or 23rd Street.  (2nd Am. Compl. ¶ 10.)  Removing Lafayette and 23rd Street

leaves Plaintiff's property without access, landlocked and valueless.  (2nd Am. Compl. ¶

11.)

      Plaintiff alleges that under certain federal regulations and statutes, the U.S.

Customs and Border Protection, an agency of the United States Government, is

responsible for enforcing the requirement that a duty free establishment must make

delivery of tax and duty-free merchandise from a sealed compound to insure exportation

of such merchandise and preclude such merchandise from returning to the United

States.  (2nd Am. Compl. ¶ 5.)  Plaintiff further contends that the U.S. Customs and

Border Protection has tacitly endorsed the taking of Plaintiff's land by finding that the

Ammex Duty Free Store operated at the Ambassador Bridge is in compliance with the

"sealed compound" requirement when the Ammex is only "sealed" due to the

expropriation of City streets.  (2nd Am. Compl. ¶ 6.)

The Michigan Supreme Court has issued an opinion affirming a lower court determination that DIBC is an instrumentality –albeit a "limited" instrumentality– of the United States Government.  (2nd Am. Compl. ¶ 4.)  Plaintiff contends that this designation has hindered or prohibited the City of Detroit from enforcing its ordinances against DIBC.  (2nd Am. Compl. ¶ 12.)

Under Count I of the "Second Amended Complaint," Plaintiff asserts that the City of Detroit has failed to enforce its ordinances against DIBC and that, therefore, the City of Detroit and the DIBC have engaged in acts that constitute a taking of Plaintiff's property rights without just compensation under the Fifth Amendment of the Constitution.   (2nd Am. Compl. ¶ 14-18.)  Plaintiff also asserts this claim against the United States of America, arguing that the Government is responsible for the actions of its agent and instrumentality, DIBC.  (2nd Am. Compl. ¶ 19-20.)  Plaintiff requests in this claim that the court (1) "[e]njoin all obstructions of 23rd and W. Lafayette in the vicinity of Plaintiff's property and affirmatively require that the streets be replaced forthwith" and (2) "[o]rder whatever other relief this [c]ourt determines to be appropriate."   (2nd Am. Compl. ¶ 20.)

Under Count II, Plaintiff asserts a claim against DIBC entitled "Intentional Trespass/Nuisance/Interference with Easement."  Plaintiff contends that DIBC has trespassed and interfered with the easement rights which Plaintiff and all other abutting land-owners share in the property "across and [a]long these roads to access their property and . . . to the center line of all roads." (2nd Am. Compl. ¶ 22.)  Plaintiff requests that the court order the abatement of DIBC's public and private nuisance, and

award damages and attorney fees associated with DIBC's trespass. (2nd Am. Compl. ¶ 28.)

In Count III, Plaintiff seeks injunctive and declaratory relief. Specifically, Plaintiff seeks a declaration that DIBC "is not a federal instrumentality or that they are otherwise bound to follow the Ordinances of the City of Detroit with respect to Plaintiff's property." (2nd Am. Compl.¶ 34.) Plaintiff also seeks injunctive relief requiring the City of Detroit to enforce its ordinances, and requiring DIBC to cease its actions with respect to W. Lafayette and 23rd Street and reconstruct the roads. (2nd Am. Compl. ¶ 34.)

In Count IV, Plaintiff asks the court to issue a mandamus requiring the City of Detroit to enforce its ordinances, ordering the abatement of Defendants' public and private nuisance, and ordering the United States to compel its agent and instrumentality to discontinue its interference with Plaintiff's property rights. (2nd Am. Compl.¶ 40.)

Count V asserts an action against DIBC under 42 U.S.C. § 1983. Plaintiff claims that DIBC's actions with respect to the relevant property has been taken under the color of state law, with a "mantle of authority" which subjects DIBC to liability under § 1983. (2nd Am. Compl. ¶¶ 42-49.)

Count IV asserts a "Bivens" claim against DIBC, arguing that DIBC has also taken its actions under the color of federal law and, as such, should be compelled to cease its alleged unconstitutional actions. (2nd Am. Compl. ¶¶ 51-54.)

Finally, in Count VI, Plaintiff asserts an "Interference with Business Expectancy" claim against DIBC.

## B. Cross Claim by the United States

In its Cross Claim, the United States asserts one Count against DIBC, entitled "Misappropriation of Federal Status."  The United States alleges that DIBC continuously holds itself out as a federal instrumentality and the United States specifically opposes this characterization of DIBC.  (Cross Cl. at ¶¶ 7-10.)  The United States contends that it is improper to invoke federal instrumentality status over the objection of the Government.  (Cross Cl. ¶ 20.)  The United States asserts that "Plaintiff Commodities has stated claims against the United States in this action on the grounds that the federal government's instrumentality, DIBC, has committed an unconstitutional taking[ ] and otherwise interfered with Commodities's rights," (Cross Cl. ¶ 15), but that because DIBC is not a federal instrumentality "DIBC's misfeasance or alleged misfeasance towards Commodities, is not properly attributable to the federal government," (Cross Cl. ¶ 21). The United States thus seeks declaratory and injunctive relief as follows:

> Pursuant to 28 U.S.C. §2201, Fed. R. Civ. Proc. 57, and this Court's inherent authority, the United States hereby requests enforcement of federal law through a declaration by the Court that DIBC is not a federal instrumentality or limited federal instrumentality or any type of appendage of the federal government.

> Pursuant to 28 U.S.C. §2202 and this Court's inherent authority, the United States hereby requests that the Court permanently enjoin DIBC and its corporate affiliates from misappropriating the status of "federal instrumentality," and to cease and desist from misrepresenting that it is any kind of federal instrumentality or other arm or agent of the federal government, in state court, federal court, or elsewhere.

(Cross Cl. ¶¶ 22-23.)

## C.  Counter-Claim and Third Party Complaint

The allegations in the Counter-Claim and Third Party Complaint are substantially similar, and are set forth below.[1]

## 1.  Ambassador Partnership

The majority of DIBC's claims relate to a partnership entered into in the mid-1990s between DIBC and MDOT (the "Ambassador Partnership").  DIBC alleges that the partnership was intended to improve access to and from the "Ambassador Bridge trade corridor."  (Counter-Compl. ¶ 10; Third Party Compl. ¶ 10.)  The Ambassador Partnership had two primary goals:  (1) improvement of the Ambassador Bridge border crossing and the transportation border infrastructure network by creating a direct connection between the Ambassador Bridge and the U.S. Interstate highway and state trunkline systems both for the Current Span and to accommodate the new span to the Ambassador Bridge (the "New Span"), and (2) undertaking specific projects including improvement of the Ambassador Bridge border crossing and the transportation border infrastructure network in the area of the Ambassador Bridge by adding the New Span. (Counter-Compl. ¶ 11; Third Party Compl. ¶ 11.)  DIBC contends that:

> The plan to accomplish these primary initial goals is commonly known as the Ambassador Bridge/Gateway Project, and each partner took the lead in accomplishing one of the Ambassador Partnership's primary initial goals, but DIBC participated in and funded to a substantial degree MDOT's portion of the Project while MDOT did not participate in nor fund to any degree DIBC's portion of the Project

(Counter-Compl. ¶ 11; Third Party Compl. ¶ 11.)

---

[1]While a recitation of the facts alleged in DIBC's Counter-Claim and Third Party Complaint may seem unnecessarily exhaustive, including the alleged facts is appropriate in order to fully understand DIBC's claims and, additionally, how these claims are firmly rooted in state law.

DIBC contends generally that the Ambassador Bridge, as a conduit for large amounts of international traffic, needed to be expanded and improved to accommodate current traffic conditions.  (Counter-Compl. ¶¶ 12-20; Third Party Compl. ¶¶ 12-20.) "DIBC, whose Ambassador Bridge is a critical component of international trade and commerce, is a federal instrumentality for purposes of facilitating traffic over the Ambassador Bridge."  (Counter-Compl. ¶ 17; Third Party Compl. ¶ 17.)

According to DIBC's allegations, in late 2000, DIBC approached several federal agencies that operate in and around the Ambassador Bridge to obtain approval to install new tollbooths, and to relocate the diesel fuel station in the duty-free plaza as well as the truck weighing stations.  (Counter-Compl. ¶ 18; Third Party Compl. ¶ 18.)  The federal agencies initially refused to allow the projects, but after DIBC adopted the changes suggested by the federal agencies, DIBC contends the federal government "no longer disapproved the projects."  (Counter-Compl. ¶ 19; Third Party Compl. ¶ 19.) DIBC contends it gained the federal government's "implicit approval" for the projects because it did not veto the projects.  (Counter-Compl. ¶ 19; Third Party Compl. ¶ 19.)

DIBC then requested the City of Detroit's approval to begin construction, but the City denied the request citing its zoning ordinance and concerns regarding increased truck exhaust and noise.   (Counter-Compl. ¶ 20; Third Party Compl. ¶ 20.)  Despite the City's disapproval, DIBC went forward with and completed the construction projects, resulting in the City issuing several citations to DIBC.   (Counter-Compl. ¶ 21; Third Party Compl. ¶ 21.)

In February 2001, the City of Detroit filed an action against DIBC, seeking issuance of an injunction to stop the construction and for enforcement of certain zoning

regulations. (Counter-Compl. ¶ 22; Third Party Compl. ¶ 22.) After a four-week bench trial, the trial court orally ruled that DIBC was immune from the zoning ordinance because of its status as a federal instrumentality and, after further negotiations between the parties failed to yield a consensual resolution, the trial court delivered a written decision in July 2004. (Counter-Compl. ¶ 23; Third Party Compl. ¶ 23.) After an appeal by the City of Detroit to the Michigan Court of Appeals and a further appeal by DIBC to the Michigan Supreme Court, the Michigan Supreme Court held that "the DIBC is a federal instrumentality for the limited purpose of facilitating traffic flow across the Ambassador Bridge and is, therefore, immune from any state law or local regulation that directly inhibits that purpose." (Counter-Compl. ¶ 24; Third Party Compl. ¶ 24 (citing *City of Detroit v. Ambassador Bridge Co.*, 748 N.W.2d 221, 233 (Mich. 2008).) DIBC states that the Michigan Supreme Court also ruled that Detroit could not, by reason of DIBC's status as a federal instrumentality, enforce its zoning ordinances or otherwise interfere with the operation of the Ambassador Bridge.[2] (Counter-Compl. ¶ 24; Third Party Compl. ¶ 24.)

DIBC contends that the State of Michigan, through its agency, MDOT, was aware of and followed the progress of the case in which the Michigan Supreme Court found DIBC to be a federal instrumentality and chose not to intervene; the decision of the Wayne County Circuit Court finding that DIBC was a federal instrumentality was attached as an exhibit to the 2004 Gateway project agreement between MDOT and DIBC. (Counter-Compl. ¶ 25; Third Party Compl. ¶ 25.)

---

[2]The ruling of the Michigan Supreme Court actually affirmed "the trial court's holding that this particular application of the city's zoning ordinance inhibits the DIBC's federal purpose." *Ambassador Bridge Co.*, 748 N.W.2d at 233.

After remand, on July 31, 2008, the Wayne County Circuit Court entered its

Permanent Injunction consistent with the ruling of the Michigan Supreme Court.

(Counter-Compl. ¶ 26; Third Party Compl. ¶ 26.)  The Permanent Injunction provides, in

pertinent part, as follows:

> IT IS HEREBY ORDERED AND ADJUDGED that the City of Detroit and
> its agencies, departments, and personnel are hereby permanently
> enjoined from enforcing or implementing any ordinance, regulation, policy,
> practice, rule or procedure the purpose or effect of which would directly
> inhibit the Detroit International Bridge Company, it successors and assigns
> conducting its activity as a federal instrumentality which includes,
> addressing, expanding, improving, managing or in any manner facilitating
> the flow of traffic across the Ambassador Bridge.

(Counter-Compl. ¶ 26; Third Party Compl. ¶ 26.)

## 2.  The MOU

On July 26, 1996, MDOT and DIBC signed the Ambassador Bridge/Gateway

Project Memorandum of Understanding ("MOU"), setting forth their joint intentions with

respect to the Ambassador Bridge/Gateway Project and further memorializing (in part)

the terms of the Ambassador Partnership.  (Counter-Compl. ¶ 27; Third Party Compl. ¶

27.)  Consistent with the primary goals of the Ambassador Partnership, the first and

second objectives listed in the MOU were to:

> 1. Provide direct access to and from the Ambassador
> Bridge to and from the trunkline system and provide
> improved access to local community (roads).
> 2. Accommodate access to meet future border crossing
> capacity needs and projected plans by DIBC for
> improvements to the Ambassador Bridge, including the
> future possibility of a new span.

(Counter-Compl. ¶ 28; Third Party Compl. ¶ 28 (citing MOU at 2).) The Ambassador

Partnership's work on the Ambassador Bridge/Gateway Project continued to progress

after the MOU was signed.  (Counter-Compl. ¶ 29; Third Party Compl. ¶ 29.)

In January 1997, an Environmental Assessment ("EA") for Phase I of the Ambassador Bridge/Gateway Project was released for public comment. (Counter-Compl. ¶ 30; Third Party Compl. ¶ 30.) The EA stated that the Ambassador Bridge/Gateway Project addressed the need to mitigate traffic congestion and to direct access between the Ambassador Bridge and Michigan's trunkline system as well as accommodate "a potential future second span of the Ambassador Bridge located west of and adjacent to the existing bridge." (Counter-Compl. ¶ 31; Third Party Compl. ¶ 31.) The EA explained that the "[t]he principal feature of the proposed project is a new deck built over a portion of the freeway system and extending toward the existing Bridge in such a way that it could align with a future second span to the west of the existing span." (Counter-Compl. ¶ 31; Third Party Compl. ¶ 31.) The EA stated that the preferred alternative route "will require taking land (no structures) from one business, but avoids taking other business property, impacting historic resources, affecting Clark Park, or causing significant impacts that were associated with other truck alternatives." (Counter-Compl. ¶ 32; Third Party Compl. ¶ 32.)

DIBC contends that the use of M-85 (Fort Street) is contemplated by and consistent with the EA. (Counter-Compl. ¶ 33; Third Party Compl. ¶ 33.) In October 1997, FHWA issued a Finding of No Significant Impact ("FONSI") for the first phase of the Ambassador Bridge/Gateway Project. (Counter-Compl. ¶ 34; Third Party Compl. ¶ 34.) The FONSI was reviewed and reaffirmed by FHWA on September 9, 1999, and again on January 15, 2004, and again on April 4, 2007. (Counter-Compl. ¶ 35; Third Party Compl. ¶ 35.)

### 3. Federal Funding

Beginning in 1998, Congress enacted a series of laws appropriating federal funds for the Ambassador Bridge/Gateway Project, including construction of the new interstate exchange. In all, approximately $230 million of federal taxpayer dollars was used on activities relating to the Ambassador Bridge/Gateway Project. (Counter-Compl. ¶ 36; Third Party Compl. ¶ 36.) DIBC's Third Party Complaint and Counter-Complaint sets forth the various allocations of funds for construction and improvement of the Ambassador Bridge/Gateway Project. (Counter-Compl. ¶¶ 36-48; Third Party Compl. ¶¶ 36-48.) DIBC asserts that "[i]n sum, all of the federal appropriations for the Ambassador Bridge/Gateway Project in furtherance of the will of Congress to complete the Ambassador Bridge/Gateway Project were consistent with the Ambassador Partnership's long term goals and the following two primary initial goals: constructing a new connection between the U.S. Interstate highway system and the Ambassador Bridge, or the Ambassador Bridge and the State trunk-line system, and constructing a New Span of the Ambassador Bridge that would make efficient use of those connections." (Counter-Compl. ¶ 48; Third Party Compl. ¶ 48.)

### 4. Ambassador Bridge/Gateway Project Agreement

MDOT and DIBC executed an agreement dated April 23, 2004, (the "Project Agreement") "for the purpose of fixing the rights and obligations of the PARTIES in agreeing to the design, construction, maintenance and operation of certain improvements to access between Highways I-75/I-96 and the Ambassador Bridge." (Counter-Compl. ¶ 49; Third Party Compl. ¶ 49.) DIBC contends that MDOT was acting on its own behalf and as agent for its "undisclosed principal," the Federal Highway

Administration, with respect to some or all of the Project Agreement. (Counter-Compl. ¶ 49; Third Party Compl. ¶ 49.)

According to DIBC, MDOT's obligations under the Project Agreement included (1) rehabilitation of a state trunkline, M-85/Fort Street ("M-85"), from Clark Street to Rosa Parks Boulevard, (2) reconstruction of the West Grand Boulevard Bridges over I-75, (3) reconstruction of the I-96/I-75 southbound service drive and the I-96 off-ramp from Vernor Highway to Michigan Avenue, (4) Construction of certain portions of the project, (5) acquisition of rights-of-way necessary to build access ramps between I-75 and I-96 and the Ambassador Bridge. (Counter-Compl. ¶ 50; Third Party Compl. ¶ 50.)

DIBC agreed to transfer property worth more than approximately $10 million to MDOT at "no cost" to the agency, in reliance on and in furtherance of the Ambassador Partnership and the Ambassador Bridge/Gateway Project, and to facilitate MDOT's eligibility for federal funds and construction under the Project Agreement. (Counter-Compl. ¶ 51; Third Party Compl. ¶ 51.)

### 5. Current Status of the Ambassador Bridge/Gateway Project

Construction of the interstate highway connections to the Ambassador Bridge began in the summer of 2007. (Counter-Compl. ¶ 52; Third Party Compl. ¶ 52.) Construction has included a complete closure of a stretch of I-75 starting in February 2008 for one and one-half years, a complete closure of a stretch of I-96 from July through September of 2008, and reconstruction of numerous surface streets facilitating access to the Ambassador Bridge. (Counter-Compl. ¶ 53; Third Party Compl. ¶ 53.)

Some of the construction for the Ambassador Bridge/Gateway Project has been completed. In July 2009, the ramps from the Ambassador Bridge to I-75 north and I-96 west for automobile were completed as well as the reconstruction of the I-75 freeway and construction of the ramps from I-75 north and south and I-96 east to the Ambassador Bridge. (Counter-Compl. ¶ 55; Third Party Compl. ¶ 55.) The I-75 freeway was opened in July 2009, however, the S29 connection ramp (Southbound I-75/Eastbound I-96 to the Ambassador Bridge plaza) or the East service drive/ Northbound I-75 exit to the Ambassador Bridge plaza (the "Ramps") has not yet opened. According to DIBC, the refusal of MDOT to open these Ramps has prohibited the parties from completing construction of the roadway and ramp for trucks from Canada to I-75 and I-96. (Counter-Compl. ¶ 55; Third Party Compl. ¶ 55.)

DIBC also contends that the MDOT detours for traffic leaving the United States that should and could be using the completed ramps has also created miles of unsafe detours for the trucks entering the United States from Canada and that, had MDOT completed its construction obligations on schedule, vehicles traveling over the Ambassador Bridge into the United States would pass through the improved plaza and onto M-85 (a state trunk line), thereby having access to I-75, I-94 and I-96. (Counter-Compl. ¶ 55; Third Party Compl. ¶ 55.)

In furtherance of the Ambassador Partnership and the Ambassador Bridge/Gateway Project, DIBC contends it has invested hundreds of millions of its private dollars in upgrading its facilities to accommodate the new interstate connections and to prepare for construction of the New Span. (Counter-Compl. ¶ 56; Third Party Compl. ¶ 56.)

DIBC further contends that, in reliance on and in furtherance of the Ambassador Partnership, it incurred the costs of property acquisition, demolition, construction of a water retention basin and pump station and construction of an electrical sub-station with full back-up generation for the complete bridge and plaza site including the new span, and construction of the improvements to both Detroit and Windsor plazas to accommodate the New Span as well as to coordinate the reconstruction of I-75 with improvements to the Ambassador Bridge approaches and plaza. (Counter-Compl. ¶ 57; Third Party Compl. ¶ 57.)

### 6. Project Design

The April 23, 2004 Agreement was amended on February 17, 2006 by the Ambassador Bridge Gateway Project Amendment (the "2006 Amendment"). (Counter-Compl. ¶ 58; Third Party Compl. ¶ 58.) As part of the April 23, 2004 Agreement and the 2006 Amendment, DIBC contends that the parties had agreed upon the basic (but not final) parameters of the design of the Gateway Project, as reflected in the concept plans attached to those Agreements. (Counter-Compl. ¶ 59; Third Party Compl. ¶ 59.) According to DIBC, it was understood and agreed among the parties that the design would remain subject to change until the Gateway Project was finally completed. (Counter-Compl. ¶ 60; Third Party Compl. ¶ 60.) Indeed, DIBC states that the design of the Gateway Project continued to be changed by the parties, as reflected in the actual construction of the Gateway Project and in the scheduled weekly meetings of the parties to discuss the status of the Gateway Project. (Counter-Compl. ¶ 61; Third Party Compl. ¶ 61.) DIBC continuously refined and modified the design of its portion (Part A, as amended) of the Gateway Project, to which changes MDOT acknowledged its assent

15

at the weekly meetings, which design at all times remained consistent with the basic (but not final) parameters of the design of the Gateway Project, as reflected in the concept plans attached to those Agreements. (Counter-Compl. ¶ 62; Third Party Compl. ¶ 62.)

As part of the Gateway Project, the parties to the Ambassador Partnership sought and obtained numerous vacations of streets and alleys that conflicted with the ultimate desired design of the Project. (Counter-Compl. ¶ 63; Third Party Compl. ¶ 63.) For example, at the time of execution of the Project Agreement, an unrelated party – Alliance Shippers – owned and occupied property (the "Alliance Property") on either side of 23rd Street north of M-85. Alliance Shippers owned the only two large properties that had frontage along 23rd Street. (Counter-Compl. ¶ 64; Third Party Compl. ¶ 64.) As a consequence of utilities in M-85 that could not be moved, and recognizing the need to provide continued access for Alliance Shippers to M-85 for so long as Alliance Shippers occupied the Alliance Property, the conceptual plans contemplated the possibility of DIBC constructing on DIBC's property a roadway leading from the truck inspection area to the interstate highway system, and a ramp over 23rd Street to allow Alliance Shippers continued access to Alliance Property. (Counter-Compl. ¶ 65; Third Party Compl. ¶ 65.)

At the time of execution of the Project Agreement, and as continuously discussed thereafter, the acquisition of the Alliance Property by DIBC was contemplated and encouraged in order to avoid the unnecessary expense of construction of the ramps, the roadway on DIBC property, and the diversion of traffic off of M-85. (Counter-Compl. ¶ 66; Third Party Compl. ¶ 66.) DIBC contends that it consistently noted that construction

of the ramps over 23rd Street to accommodate Alliance Shippers was a mere contingency in the event DIBC could not acquire the Alliance Property. (Counter-Compl. ¶ 67; Third Party Compl. ¶ 67.) DIBC, however, was able to acquire the Alliance Property, and asserts that the acquisition eliminates the need to divert traffic off of M-85 and onto DIBC's property, or to construct the private roadway (and the ramps over former 23rd Street).

Thus, following its acquisition of the Alliance Property, DIBC advised MDOT that DIBC would not construct the private roadway (and the ramps over former 23rd Street) and would instead (1) have traffic within DIBC's property proceed at grade and (2) permit traffic on M-85 to continue to use M-85 without diverting that traffic onto DIBC's property. (Counter-Compl. ¶ 68; Third Party Compl. ¶ 68.)

M-85 is designated as a state trunkline and continues to be used as a truck route. The environmental assessments and re-evaluations approved by FHWA indicate M-85's continued use as a state trunkline. (Counter-Compl. ¶ 70; Third Party Compl. ¶ 70.) Phase 1 of the Gateway Project, completed in 2003, included a series of upgrades to M-85 to ensure its continued use as a state trunkline by commercial traffic. (Counter-Compl. ¶ 71; Third Party Compl. ¶ 71.)

DIBC contends that the use of M-85 for its intended purpose, and the deletion of the private roadway on DIBC's property and the associated ramps, were not material changes to the basic but not final parameters of the Gateway Project, since (1) the resulting design remains consistent with the conceptual design for the Project and would meet the goals of the Project without wasting millions of dollars, and (2) an earlier change to provide for the use of approximately 300 feet of M-85 for truck traffic exiting

the Ambassador Bridge plaza was not a material change to the Project (DIBC's proposed change would simply extend the use of M-85 for an additional approximate 350 feet). (Counter-Compl. ¶ 72; Third Party Compl. ¶ 72.) Specifically, DIBC asserts that the conceptual, basic (but not final) parameters of the Gateway Project anticipated the possibility that DIBC would not be able to purchase the Alliance Property and would be required to construct an elevated ramp over 23rd Street to provide access to the large trucking business conducted by Alliance Shippers that was situated on both sides of 23rd Street north of M-85. Now that DIBC owns the Alliance Property, DIBC argues that the elevated ramp is unnecessary. (Counter-Compl. ¶ 73; Third Party Compl. ¶ 73.)

The original preliminary design of the 23rd Street ramp (Alliance Shippers overpass), identified as the S04 and S05 locations on DIBCs property, was proposed because an overpass on M-85 (Fort Street) could not be constructed due to the massive utilities located under the north right of-way of M-85. The location of the 23rd Street ramp, if built, meant that a portion of M-85 traffic would be required to leave M-85 and then traverse a portion of DIBC's property. Since the ramp is no longer required, Fort Street (M-85) can continue in its current location and there is no reason for M-85 traffic to enter DIBC's property. This is all domestic traffic because it has crossed the Bridge, cleared U.S. Customs and has been released for entry into the United States. Domestic traffic is not and has never been DIBC's responsibility. (Counter-Compl. ¶ 74; Third Party Compl. ¶ 74.)

Further, DIBC also contends that the City of Detroit long ago rezoned the Alliance Shippers property as "Bridge and Bridge Related" use with the understanding

that the former Alliance Shippers property would become part of and incorporated into the Gateway Project.  (Counter-Compl. ¶ 75; Third Party Compl. ¶ 75.)

### 7. The Easement

DIBC admits that, as of the execution of the 2004 Project Agreement, Counter-Defendant Commodities Export and Third Party Defendant Walter Lubienski each owned a vacant lot (together, the "Vacant Property") situated within the boundary of the area identified as "Part A", and DIBC also asserts that Part A was to be improved by DIBC consistent with the Project Agreement.  (Counter-Compl. ¶ 76; Third Party Compl. ¶ 76.)

Part of the Vacant Property fronted and had access to Howard Street; the Vacant Property did not front any other road.  (Counter-Compl. ¶ 77; Third Party Compl. ¶ 77.) Initially, DIBC anticipated that it would purchase the Vacant Property, so that DIBC would own, in a contiguous manner, all of the property in Part A of the Project. DIBC, however, could not complete the purchase of the Vacant Property because agreement could not be reached as to the price of the Vacant Property.[3]  (Counter-Compl. ¶ 78; Third Party Compl. ¶ 78.)

Pursuant to the 2006 Amendment, MDOT undertook responsibility for acquiring the Vacant Property, but only to the extent "necessary" for the Ambassador Bridge/Gateway Project.  (Counter-Compl. ¶ 79; Third Party Compl. ¶ 79.)  After the Amendment was signed, DIBC alleges that the City of Detroit vacated Howard Street and MDOT eliminated access to the I-75 Service Drive from the Vacant Property so that

---

[3]DIBC asserts that "the property owners made exorbitant and unreasonable monetary demands."  (Counter-Compl. ¶ 78; Third Party Compl. ¶ 78.)

the Vacant Property would become landlocked (i.e., it does not front or have direct access to any road) if it were not served by the easement proposed to be constructed by DIBC.  (Counter-Compl. ¶ 80; Third Party Compl. ¶ 80.)

Prior to signing the Amendment, DIBC proposed two alternatives for connecting traffic departing the bridge to the interstate highway system in a manner that did not include any encroachment onto the Vacant Property.  (Counter-Compl. ¶ 81; Third Party Compl. ¶ 81.)  These two alternatives would purportedly meet the goals of the Ambassador Bridge/Gateway Project without having to condemn any of the Vacant Property.  (Counter-Compl. ¶ 82; Third Party Compl. ¶ 82.)  DIBC argues that pursuant to the Project Agreement, MDOT had an obligation to agree to one or the other alternatives, since MDOT's consent to modifications cannot be unreasonably withheld, conditioned or delayed.  (Counter-Compl. ¶ 83; Third Party Compl. ¶ 83.)  DIBC believed the result would be either (1) no condemnation of the Vacant Property would ever occur because it would not be "necessary"; or (2) condemnation of the entirety of the Vacant Property to maintain contiguous control of the property within the confines of the Ambassador Bridge/Gateway Project.  (Counter-Compl. ¶ 84; Third Party Compl. ¶ 84.)  However, neither occurred; instead, condemnation of only portions of the Vacant Property occurred (the "MDOT Condemnation Proceedings") so that MDOT or DIBC could construct roads and bridges over those portions, leaving a portion of the Vacant Property (the remaining portion shall be referred to as the "Remainder").  (Counter-Compl. ¶ 85; Third Party Compl. ¶ 85.)

DIBC alleges that the condemnation action was incomplete and inadequate because the essential element of necessity to support the condemnation action was

never established; Mr. Lubienski and Commodities Export Co. objected to the condemnation on grounds that necessity was absent and had not been established, and claimed that a taking of part of the property constituted, under the circumstances, a taking of the whole. (Counter-Compl. ¶ 86; Third Party Compl. ¶ 86.)

According to DIBC, the three-year "temporary" taking of a portion evidences that the "Remainder" portion of the Vacant Property has no value and the Vacant property should have been condemned in its entirety. (Counter-Compl. ¶ 87; Third Party Compl. ¶ 87.)

DIBC contends that MDOT improperly asserted that there was a "necessity" to support condemnation of more property of the Lubienski Parties allegedly for the benefit of DIBC that DIBC simply does not need. (Counter-Compl. ¶ 88; Third Party Compl. ¶ 88.)  After the Wayne County Circuit Court denied the challenges by Commodities Export Co. and Walter Lubienski to MDOT's finding of necessity, the Circuit Court entered an Order for Surrender of Possession and Payment of Estimated Just Compensation (the "Order for Possession"). (Counter-Compl. ¶ 89; Third Party Compl. ¶ 89.)

DIBC states that the efficacy of the Circuit Court's Order for Possession was premised upon the propriety of the Circuit Court's "finding of necessity." (Counter-Compl. ¶ 90; Third Party Compl. ¶ 90.)  The Circuit Court ordered that MDOT "enforce" the alleged obligation of DIBC to provide an easement to the "Remainders" as part of the Order for Possession. (Counter-Compl. ¶ 91; Third Party Compl. ¶ 91.)  MDOT, on behalf and for the benefit of Commodities Export Co. and Walter Lubienski, falsely represented to DIBC that the Order for Possession was final. (Counter-Compl. ¶ 92;

Third Party Compl. ¶ 92.) MDOT, on behalf and for the benefit of Commodities Export Co. and Walter Lubienski, represented to DIBC that DIBC had a then-present obligation to grant an Easement to the portion of the Vacant Property (improperly) determined by MDOT not to be necessary for the Project (the "Remainders"). (Counter-Compl. ¶ 93; Third Party Compl. ¶ 93.)

DIBC contends that based on the "false representation" from MDOT that the Vacant Property condemnation was complete (with an appropriate finding of necessity), DIBC, together with Mexicantown Realty and AMMEX (owners of other parcels whose consent was necessary to establish an easement that would give Mr. Lubienski and Commodities Export Company the access described in the Amendment) were induced to execute an easement (the "Easement") in favor of Mr. Lubienski and Commodities Export Company for access to the public highway. (Counter-Compl. ¶ 94; Third Party Compl. ¶ 94.)

DIBC (together with Mexican Town Realty and AMMEX, Inc.) granted the Easement based upon the representations by MDOT, and having been provided with the Order of Possession and the "finding of necessity," without knowledge of the pending appeal by the Lubienski Parties from the denial of their challenges to the "finding of necessity." (Counter-Compl. ¶ 95; Third Party Compl. ¶ 95.) DIBC alleges that it would not have granted the Easement but for the representation by MDOT that the Order for Possession and "finding of necessity" were final, and that DIBC had a then-present obligation to grant the Easement. (Counter-Compl. ¶ 96; Third Party Compl. ¶ 96.) DIBC asserts that MDOT, on behalf of itself, Commodities Export Co. and Lubienski, breached its duty to advise DIBC of the pending appeal by Commodities

Export Co. and Lubienski from the denial of their challenges to the "finding of necessity" because DIBC is a partner with MDOT and because DIBC was the real party in interest in the MDOT Condemnation Proceedings. (Counter-Compl. ¶ 97; Third Party Compl. ¶ 97.) MDOT apparently also represented to DIBC, as a condition to DIBC's provision of the Easement, that MDOT would cooperate with DIBC in amending the Easement to meet the parties' goals. (Counter-Compl. ¶ 98; Third Party Compl. ¶ 98.)

On February 7, 2008, after DIBC, AMMEX and Mexicantown had executed and delivered the Easement, the Court of Appeals reversed the "finding of necessity" and remanded the matter to the trial court for further proceedings. (Counter-Compl. ¶ 99; Third Party Compl. ¶ 99.) The Order for Possession was automatically vitiated when the Court of Appeals reversed the Circuit Court's rejection of Commodities Export Co.'s and Mr. Lubienski's challenges to the "finding of necessity." (Counter-Compl. ¶ 100; Third Party Compl. ¶ 100.) Immediately prior to the evidentiary hearing on the issue of "necessity," MDOT asserted that the MDOT Condemnation Proceedings could not proceed in the absence of DIBC, and that DIBC was a necessary party to afford complete relief. (Counter-Compl. ¶ 101; Third Party Compl. ¶ 101.) MDOT asserted that DIBC was a necessary party based upon MDOT's claim that DIBC is liable to MDOT for the amount of "just compensation" to be paid by MDOT to the Lubienski Parties and CBS Outdoor (a third defendant to the condemnation proceedings). (Counter-Compl. ¶ 102; Third Party Compl. ¶ 102.) Commodities Export and Walter Lubienski opposed the joinder of DIBC in the MDOT Condemnation Proceedings. (Counter-Compl. ¶ 103; Third Party Compl. ¶ 103.) The Wayne County Circuit Court

denied MDOT's request to join DIBC in the MDOT Condemnation Proceedings. (Counter-Compl. ¶ 104; Third Party Compl. ¶ 104.)

DIBC thereafter sought to intervene in the MDOT Condemnation Proceedings. (Counter-Compl. ¶ 105; Third Party Compl. ¶ 105.) DIBC further asserted that if it were the real party in interest as MDOT claimed, and DIBC was permitted to intervene, it would consent to the dismissal of the MDOT Condemnation Proceedings. (Counter-Compl. ¶ 106; Third Party Compl. ¶ 106.)

MDOT opposed DIBC's efforts to intervene in the MDOT Condemnation Proceedings, even though it had earlier asserted that the MDOT Condemnation Proceedings could not proceed in the absence of DIBC, and that DIBC was a necessary party to afford complete relief. (Counter-Compl. ¶ 107; Third Party Compl. ¶ 107.) Following the denial of DIBC's efforts to intervene in the MDOT Condemnation Proceedings, MDOT entered into an agreement with Walter Lubienski and Commodities Export Co. for a "finding of necessity" by the court. (Counter-Compl. ¶ 108; Third Party Compl. ¶ 108.) DIBC contends that MDOT's "agreement" with the Lubienski Parties for a "finding of necessity" by the court is not binding upon DIBC. (Counter-Compl. ¶ 109; Third Party Compl. ¶ 109.)

DIBC contends that the 2006 Amendment provided two conditions precedent to the creation of an easement: (a) a determination that the Vacant Property is necessary to the Ambassador Bridge/Gateway Project; and (b) a determination that the Ambassador Bridge/Gateway Project will cut off the Vacant Property's access to the state highway system. According to DIBC, neither of these conditions has occurred. (Counter-Compl. ¶ 110; Third Party Compl. ¶ 110.)

### 8.  The Bait Shop Property

Plaintiff/Counter-Defendant Commodities Export Co. claims to be the owner of certain real property commonly known as 3317-3325-3331 W. Lafayette, Detroit, Michigan (the "Bait Shop Property"), upon which is located an alleged business known as the Lafayette Bait & Tackle Shop.  (Counter-Compl. ¶ 111; Third Party Compl. ¶ 111.)  DIBC contends that the Bait Shop Property is located in the middle of the Gateway Project, and within the "sterile compound" that DIBC has sought to create; MDOT failed and/or refused to acquire the Bait Shop Property by condemnation or other means.  (Counter-Compl. ¶ 112; Third Party Compl. ¶ 112.)

Contrary to DIBC's assertions in other pleadings before the court, DIBC specifically claims that the Bait Shop Property, and continued public access to the Bait Shop Property, poses a security risk to the Ambassador Bridge and DIBC's performance of its duties as a limited federal instrumentality.  (Counter-Compl. ¶ 113; Third Party Compl. ¶ 113.)  According to DIBC, MDOT is claiming that the Bait Shop Property "is DIBC's problem" and has refused DIBC's request to modify the Project Agreement to have MDOT acquire by way of condemnation all of the property for the Gateway Project footprint to ensure that the Ambassador Bridge which is listed on the federal critical infrastructure list could be easily secured from external forces.  (Counter-Compl. ¶¶ 114;-15 Third Party Compl. ¶¶ 114-15.)

DIBC contends that Paragraph 26 of the Project Agreement requires MDOT to agree to changes to the Gateway Project necessary for national security and condemnation of the Bait Shop is necessary to ensure that the Gateway Project is

completed in a safer, more secure and operationally efficient manner, and in the interests of national security secured from the threat of external forces. (Counter-Compl. ¶¶ 116-17; Third Party Compl. ¶¶ 116-17.)

### 9. DIBC's Claims

DIBC asserts seven state-law counts in its Counter-Complaint and Third Party Complaint.

In Count I, DIBC asserts a "Request for Declaratory and Injunctive Relief" count regarding the Vacant Property. Specifically, DIBC requests a declaration that DIBC has been relieved of any obligation to provide or maintain the Easement, and requiring Commodities and Lubienski to convey the Remainder to MDOT, for the benefit of DIBC. DIBC also requests that the court declare that Commodities and Lubienski are estopped from claiming any rights in or entitlement to the Easement and permanently enjoin Commodities and Lubienski from claiming any right to an easement from the Vacant Property (or the Remainder) to a public highway pursuant to the 2004 Project Agreement.

In Count II, entitled "Request for Revocation of Easement," DIBC asserts that it executed the Easement based upon the representations by MDOT, and having been provided with the Order of Possession and the "finding of necessity," without knowledge of the pending appeal by the Lubienski Parties from the denial of their challenges to the "finding of necessity." The finding of necessity was subsequently reversed by the Michigan Court of Appeals, and DIBC contends that, as a result, it is entitled to a declaration that (1) the execution and delivery of the Easement was procured by fraud and (2) the Easement is void ab initio, and of no legal force or effect. DIBC also

requests that the court permanently enjoin Commodities and Lubienski from claiming any right to an easement from the Vacant Property (or the Remainder) to a public highway pursuant to the 2004 Project Agreement.

Count III is entitled "Request for Reformation of Easement," and again addresses the enforceability of the Easement.  In this count, DIBC asserts that, if the Easement is not revoked, and if Commodities and Lubienski are entitled to an easement from the Remainder to a public highway, then DIBC is entitled to reformation of the Easement previously executed.  That is, DIBC contends that either DIBC was defrauded by MDOT (purportedly acting for the benefit of Commodities and Lubienski) or there was a mutual mistake by MDOT and DIBC that those parties could amend the Easement without the consent or cooperation of Commodities Export and Walter Lubienski.  DIBC requests that, based upon either the fraud or mutual mistake, DIBC is entitled to an amendment of the Easement to provide for ingress/egress from West Grand Boulevard, and not M-85.

Count IV is entitled "Request for Declaratory Relief Re: Necessity of Vacant Property for Gateway Project/Fraud/Tortious Interference."  DIBC contends that there was no factual basis for the Stipulation by Commodities and Lubienski in the MDOT Condemnation Proceeding that its portion of the Vacant Property was necessary for the Gateway Project or any other public purpose and that their representations to the Wayne County Circuit Court to the contrary were false representations of material fact which were made for the purpose of inducing the Wayne County Circuit Court to rely upon them, to the detriment of DIBC.   DIBC contends that the Wayne County Circuit Court in fact relied upon the representations and that the false representations were

made for the purpose of causing MDOT to breach its contractual obligations to DIBC. Thus, DIBC asserts that Commodities and Lubienski intentionally interfered with DIBC's contract with MDOT, causing MDOT to breach its contract with DIBC. DIBC requests that the court declare that the Vacant Property was not necessary for the Gateway Project and award damages in favor of DIBC.

In Count V, DIBC requests "Declaratory Relief Re: 23rd Street." Here, DIBC contends that upon DIBC's acquisition of the Alliance Property, and closure of 23rd Street to the public, the use of the remainder of 23rd Street by the public was discontinued by law and that remainder of 23rd Street automatically reverted to DIBC pursuant to the terms of the initial plat. DIBC requests a declaration that this portion of 23rd street within the Porter Farm Subdivision has reverted to DIBC in fee simple, by reason of the cessation of the use of that street for public purposes and that, therefore, the 23rd Street Defendants retain no lawful rights in that portion of former 23rd Street within the plat of the Porter Farm Subdivision. DIBC further seeks a declaration that DIBC has no obligation to afford public access to that portion of former 23rd Street within the plat of the Porter Farm Subdivision and that any requirement that DIBC allow public use of former 23rd Street within the plat of the Porter Farm Subdivision could lawfully be effected only by the institution of condemnation proceedings against such property.

In Count VI, DIBC asserts an abuse of process claim against Commodities and Lubienski. DIBC alleges that Commodities, by reason of its filing of the Stipulation to a finding of necessity to support the MDOT Condemnation Proceedings, and the filing of a Case Evaluation Summary containing false statements intended, used lawful process

for an unlawful purpose.  Specifically, DIBC alleges the unlawful purpose was to induce the Wayne County Circuit Court to take action that it would not have otherwise taken (the entry of an Order sustaining MDOT's claim of necessity) and to gain a case evaluation award to which Commodities and Lubienski are not entitled, all to improperly provide MDOT with a basis upon which to continue to assert against DIBC a claim for indemnification and/or reimbursement, and to cause DIBC to grant to Commodities and Lubienski valuable property rights (the Easement) to which Commodities and Lubienski are not lawfully entitled.  DIBC seeks damages for the actions of Commodities and Lubienski.

Finally, in Count VII, DIBC asserts a claim for "Revocation of Abandonment of Alley or for Establishment of Easement by Necessity."   This claim is premised on the alleged fact that the City of Detroit claims to have vacated that alley between separating the two parcels comprising the Vacant Property.   According to DIBC, any abandonment by the City of Detroit of the alley was made based upon the mistaken belief that such alley did not service any other parcels and the alley was mistakenly vacated or abandoned by the City of Detroit.  Thus, DIBC contends that the vacation and/or abandonment must be set aside or that, alternatively, the court should declare that what was once a public alley is now an easement for the benefit of the owner and users of Lot 19 including DIBC.

## II. STANDARD

A district court has the power to dismiss or remand claims *sua sponte* for lack of subject matter jurisdiction.[4]  *See, e.g., Douglas v. E.G. Baldwin & Assocs.*, 150 F.3d 604, 607 (6th Cir. 1998).  Claims with original jurisdiction in a district court have either federal question jurisdiction pursuant to 28 U.S.C. § 1331 or diversity jurisdiction pursuant to 28 U.S.C. § 1332.  In some circumstances, additional claims alleging violations of only state law may be heard under the supplemental jurisdiction granted pursuant to 28 U.S.C. § 1367.

In *United Mine Workers of America v. Gibbs*, 383 U.S. 715 (1966), the Supreme Court broadly authorized federal courts to assert jurisdiction over state law claims when there existed a "common nucleus of operative fact" comprising "but one constitutional 'case,'" so long as the court had original jurisdiction over at least one claim.  *Gibbs*, 383 U.S. at 725.  While this decision granted district courts broad power over pendent state claims, it also recognized discretion in hearing such claims: "[P]endent jurisdiction is a doctrine of discretion, not of plaintiff's right.  Its justification lies in considerations of

_____

[4]While the court considers this order to be a *sua sponte* dismissal, the parties have nonetheless briefed this issue as related to the United States's "Motion for Judgment on the Pleadings and to Dismiss State Law Claims for Lack of Jurisdiction." The United States filed its motion seeking similar relief however, as had perhaps already been telegraphed to the parties during hearings and conferences, the court was already contemplating a *sua sponte* dismissal.  The court's decision to dismiss the state law claims has been made after considering arguments made by the parties, not only in the briefs related to the United States's motion, but arguments made in other motions pending before, or already resolved by, the court.  Fundamentally, the court has been inclined to dismiss the state law claims for some time but has been hesitant to do so at too early of a stage in the litigation, before fully hearing the parties on the various issues presented in recently-filed motions.

judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over the state claims . . . ." *Id.* at 726. The Court stated that pendent party jurisdiction may be denied "if the federal claims are dismissed before trial," if "it appears that the state issues substantially predominate," or "if the likelihood of jury confusion" would be strong without separation of the claims. *Id.* at 726-27.

Congress later codified the power of a federal court to hear state claims. 28 U.S.C. § 1367. Similar to the standards articulated in *Gibbs*, the statute recognizes a court's discretion to decline to exercise supplemental jurisdiction if:

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).

Though § 1367 technically superseded *Gibbs*, courts agree that "the exercise of discretion . . . is still informed by whether remanding the pendent state claims comports with the underlying objective of 'most sensibly accommodating' the values of 'economy, convenience, fairness and comity.'" *Executive Software N. Am., Inc. v. U.S. Dist. Court*, 24 F.3d 1545, 1557 (9th Cir. 1994) (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)); *see also* H.R. REP. NO. 101-734, at 29 (1990), *reprinted in* 1990 U.S.C.C.A.N. 6860, 6875 (indicating that, under *Gibbs* and "current law, subsection (c)

requires the district court, in exercising its discretion, to undertake a case-specific analysis.").

## III.  DISCUSSION

In *Carnegie-Mellon University v. Cohill*, the Supreme Court held that "a federal court should consider and weigh in each case, and *at every stage of the litigation*, the values of judicial economy, convenience, fairness, and comity . . . to decide whether to exercise jurisdiction over a case . . . involving pendent state-law claims."  484 U.S. 343, 350 (1988) (emphasis added).  For the reasons discussed below, the court finds that the state law claims should be dismissed.

### A.  Dismissal Pursuant to 28 U.S.C.  § 1367(c)(2)

A district court may decline the exercise of supplemental jurisdiction pursuant to § 1367 if "the [state] claim substantially predominates over the claim or claims over which the district court has original jurisdiction."  28 U.S.C. § 1367(c)(2).  In *Gibbs*, the Supreme Court noted that "if it appears that the state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought, the state claims may be dismissed without prejudice and left for resolution to state tribunals."  *Gibbs*, 383 U.S. at 726-27.  Although there is no definitive test for determining whether state law claims predominate over federal law claims, "courts have considered such factors as whether they outnumber the federal law claims; whether the claims are distinct; and whether [the] state law claims involve proof that is not needed to establish the federal law claims."  *Williamson v. Recovery Ltd. P'ship, No.*, C2-06-292, 2009 WL 649841, at *9 (S.D. Ohio March 11, 2009).

Here, the court is convinced that the sheer volume of the state law claims, the scope of the issues raised in the state law claims, as well as the comprehensiveness of the remedy sought in the claims, are such that they are best left for resolution by the state courts. Indeed, although it was not apparent in the early stages of this lawsuit, it has become glaringly so over recent months that most–if not all–of the state law issues implicated in this lawsuit have already been decided or are currently pending before various state court judges.[5]

The state law claims implicated in this case deal with not only with traditional state law torts and contractual rights and obligations, but with long-standing property rights of private parties and government entities, areas of law traditionally better suited to the state courts. Indeed, the focus of this lawsuit has shifted over the past eighteen months from an action which primarily focused on a determination regarding DIBC's alleged status as a federal instrumentality (and any attendant duties of the United States to control or account for the actions of its instrumentality) to a lawsuit which, due

---

[5]In the briefs related to the United States "Motion for Judgment on the Pleadings and to Dismiss State Law Claims for Lack of Jurisdiction," the City of Detroit argues, and the United States to some extent agrees, that the court should continue to exercise jurisdiction over DIBC's counterclaim and third party claim related to the seizure of 23rd Street. (*See* Detroit's Resp. at 3, 6, Dkt. # 97; United States Reply at 5, Dkt. # 98.) The parties argue that, although the issue presented in that claim is currently pending before a state court judge, the claim was brought first in this court. The parties also contend this issue more closely fits within the confines of Plaintiff's original complaint and, additionally, all of the parties implicated by this issue are parties in this litigation, whereas they are not all parties in the state court action. While the court agrees that this issue is the state law claim that is most closely associated with the federal issues in this case, it is nonetheless still a state law claim and, more importantly, a state law claim which will predominate the federal issues. Accordingly, the court will not treat DIBC's Count V separately than the other state law claims and will likewise dismiss it without prejudice.

to the myriad state law claims asserted by Plaintiff and DIBC, asks the court to determine and declare various property rights of the parties.

The determination of these state law claims, and most particularly the property rights claims, will cause a substantial expansion of this lawsuit–beyond that which is required to determine the federal issues. "Federal courts have not hesitated to dismiss or remand state causes of action under § 1367(c)(2) when the state claims would require elements of proof distinct from the federal claim, and cause a substantial expansion of the suit beyond that necessary and relevant to the federal claim." *Rugumbwa v. Betten Motor Sales*, 200 F.R.D. 358, 368 (W.D.Mich. 2001) (citing *Green v. Zendrian*, 916 F.Supp. 493, 498 (D. Md. 1996)).

The court recognizes that "[w]hen a district court exercises its discretion not to hear state claims under § 1367(c)(2), the advantages of a single suit are lost. For that reason, § 1367(c)(2)'s authority should be invoked only where there is an important countervailing interest to be served by relegating state claims to the state court." *Borough of West Mifflin v. Lancaster,* 45 F.3d 780, 789 (3d Cir. 1995). However, such a countervailing exists where, as here, "'a state claim constitutes the real body of a case, to which the federal claim is only an appendage,' *Id.* (quoting *Gibbs*, 383 U.S. at 727). The court is keenly cognizant of the benefits of litigating all related claims in a single forum, but is also aware that dismissal is appropriate "where permitting litigation of all claims in the district court can accurately be described as allowing a federal tail to wag what is in substance a state dog." *Id.*

This case has become one gigantic state dog.

While the state law claims are, for the most part, related to the federal issues presented in this case, they would substantially predominate over the federal claims. The state law claims are not only numerous and broad, but they implicate uniquely local issues. Courts have "not hesitated to decline to exercise jurisdiction over those issues presented by a case which, although the entire case is properly before the court, are purely local issues having no real place in the federal system." *Hoste v. Shanty Creek Management, Inc.*, 246 F. Supp. 2d 776, 783 (W.D. Mich. 2002); *see also Bostic v. AT & T of Virgin Islands*, 166 F.Supp.2d 350, 364 (D.Vi.2001) ("At a trial on the merits, the vast majority of evidence in this case would pertain solely to the [non-federal] claims."); *James v. Sun Glass Hut of Cal., Inc.* 799 F.Supp. 1083, 1085 (D.Colo.1992) (finding state law predominated where they were more numerous and required different proofs than the federal claim, and would "substantially expand the scope of this case").

Because the state law issues predominate over any federal issues, the court finds dismissal appropriate under 28 U.S.C. § 1367(c)(2).

## B. Dismissal Pursuant to 28 U.S.C. § 1367(c)(4)

A district court may deny supplemental jurisdiction pursuant to § 1367(c)(4) if, "in exceptional circumstances, there are other compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c)(4) (2006). "Congress's use of the word 'other' to modify 'compelling reasons' indicates that what ought to qualify as 'compelling reasons' for declining jurisdiction under subsection (c)(4) should be of the same nature as the reasons that gave rise to the categories listed in subsections (c)(1)-(3)." *Executive Software*, 24 F.3d at 1557. Once the court decides that there are compelling reasons to

decline jurisdiction, the factors that inform this decision usually will demonstrate how the circumstances confronted are "exceptional." *Id.* at 1558.

### 1. "Compelling Reasons" for Dismissing Plaintiff's State Law Claims

Courts generally accept that "compelling reasons for the purposes of [§ 1367] (c)(4) . . . should be those that lead a court to conclude that declining jurisdiction best accommodates the values of economy, convenience, fairness and comity." *Executive Software*, 24 F.3d at 1557 (internal citations omitted); *see also Palmer v. Hosp. Auth. of Randolph County*, 22 F.3d 1559, 1569 (11th Cir. 1994). When deciding whether to agree or decline to exercise jurisdiction over supplemental state claims, the court considers the circumstances of the particular case, the nature of the state law claims, the character of the governing state law, and the relationship between the state and federal claims. As the Supreme Court has recognized, "a federal court's determination of state-law claims could conflict with the principle of comity to the States and with the promotion of justice between the litigating parties." *Carnegie-Mellon University v. Cohill* 484 U.S. 343, 349-350 (1988)

### 2. This Case Presents "Exceptional Circumstances"

Courts must ensure that the reasons for declining to exercise supplemental jurisdiction identified as "compelling" are not deployed in circumstances that are not "exceptional." *Executive Software*, 24 F.3d at 1558. Courts agree that the inclusion of the phrase "exceptional circumstances" limits the broad discretion that district courts once entertained under *Gibbs* to deny supplemental jurisdiction in any case. *See, e.g., Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 140 F.3d 442, 448 (2d Cir. 1998); *Executive Software*, 24 F.3d at 1558. However, Congress only "sounded a note

of caution" and did not restrict a district court's ability to dismiss claims only in cases that were "ridiculous" or "impractical." *Executive Software*, 24 F.3d at 1558, 1560 (citing *Hays County Guardian v. Supple*, 969 F.2d 111 (5th Cir. 1992) (holding that exceptional circumstances were present when parallel state proceedings were underway and therefore the adjudication of state claims would be a "waste of judicial resources.")).

The court finds that the strong federalism and comity concerns involved in this case constitute "exceptional circumstances" to caution against exercising jurisdiction in this case. As all of the parties admit, the majority of issues involved in the state law claims have already been presented or are currently pending before various state court judges. Another judge in this district has, under similar circumstances, declined to exercise jurisdiction over state law claims:

> The parties also apprised the court that a related state court proceeding is pending in Wayne County Circuit Court. In fact, the parties acknowledged some overlap or duplication of claims among the state law based counts between the two lawsuits. Considering the circumstances of this particular case, the nature of the parties' state law claims and counterclaims, the relationship between the state and federal claims and counterclaims, and the values of judicial economy and comity, the court hereby declines to exercise supplemental jurisdiction over the parties' state law claims and counterclaims.

*Armada Oil & Gas Co., Inc. v. Eppco, Inc.*, No. 06-CV-10269, 2006 WL 950266, *2 (E.D. Mich. April 12, 2006). Likewise, the court finds that exercising jurisdiction over the state law claims–which are abnormally interwoven in multiple state court proceedings–would implicate serious federalism concerns.

Even if the state law claims are not barred by collateral estoppel (an issue that, were the court to retain jurisdiction, the court would next focus upon), the court would nonetheless abstain from disturbing the state court proceedings on the issues raised in

the state law claims. The Sixth Circuit has stated that it is "concerned about the principles underlying abstention, not its precise limitations." *Gottfried v. Medical Planning Services, Inc.*, 142 F.3d 326, 330. To that end, the court will "keep in mind the Supreme Court's recent advice that '[t]he various types of abstention are not rigid pigeon holes' but instead 'reflect a complex of considerations designed to soften the tensions inherent' in a dual state-federal system of justice." *Id.* (citing *Penzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 11-12 n. 9 (1987)).

Here, the nature of the state law claims implicate obvious federalism concerns and are better suited to be litigated in the state court system. Concerns of comity and federalism dissuade this court from allowing the parties to seek an end-run around a state court litigation which involves state law issues.[6] Except under very unusual circumstances, the court refuses to interfere in underlying state court proceedings. *See generally Lambert v. Turner*, 525 F.2d 1101, 1103 (6th Cir. 1975) ("[C]onsiderations of comity preclude a federal court from supervising the operations of a state court in the manner sought in the amended complaint.").

_____

[6]The court recognizes that DIBC argues that the United States is similarly seeking an end-run around the Michigan Supreme Court's decision that DIBC is a federal instrumentality. However, the Government did not participate in the state court litigation resulting in the Michigan Supreme Court's decision, whereas here, the parties, and particularly DIBC, are parties to the cases before Judge Edwards and Judge McDonald. Additionally, Judge Edwards' case involves identical property issues as those presented to this court, whereas the Michigan Supreme Court decision involved whether the City of Detroit could enforce its ordinances with respect to tollbooths against DIBC, an alleged federal instrumentality. This case involves a different set of allegations regarding the City of Detroit's obligations and DIBC's alleged misfeasance. Further, and most importantly, the decision to decline jurisdiction over state law claims is within the court's discretion whereas, absent circumstances not present here, the court is required to exercise jurisdiction over federal law issues, such as the question of whether DIBC is a federal instrumentality.

For all of these reasons, the court will decline to exercise jurisdiction of the state law claims in this case. The court will dismiss the state law claims without prejudice and allow them to proceed where they properly belong–in state court.

## IV. CONCLUSION[7]

IT IS ORDERED that Counts II and VII in Plaintiff's Second Amended Complaint [Dkt. # 39], are hereby DISMISSED WITHOUT PREJUDICE. Further, those portions of Counts III and IV seeking declaratory or injunctive relief or a mandamus under state law are also DISMISSED WITHOUT PREJUDICE.

Further, because DIBC has presented only state law claims, the entirety of the Third Party Complaint [Dkt. # 47] and the Counter-Claim [Dkt. # 41] are DISMISSED WITHOUT PREJUDICE.

    S/Robert H. Cleland
    ROBERT H. CLELAND
    UNITED STATES DISTRICT JUDGE

Dated: September 30, 2010

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, September 30, 2010, by electronic and/or ordinary mail.

    S/Lisa Wagner
    Case Manager and Deputy Clerk
    (313) 234-5522

S:\Cleland\JUDGE'S DESK\C3 ORDERS\09-11060.COMMODITIES.DismissStateClaims.SuppJurisdiction.wpd

---

[7]Contrary to DIBC's assertions, the court does not interpret the United States's Cross Claim as asserting any state law claims.